[File No. 5895.]

DONALD FRANCIS HUNDER, a Minor, by William Hunder, His Guardian, Respondent, v. JOHN RINDLAUB and Elizabeth Rindlaub, Appellants.

(237 N. W. 915.)

Opinion filed August 22, 1931.

*Richardson, Thorpe & Wattam, Conmy, Young & Conmy* and
*Charles J. Vogel,* for appellant.

394

*Shure & Murphy, Murphy & Johanson* and *Roger L. Dill,* for respondent.

CHRISTIANSON, Ch. J.  Plaintiff brought this action to recover damages against the defendants for alleged negligence in the treatment of an injured eye.  The jury returned a verdict in favor of the plaintiff for $29,850.00.  Judgment was entered upon the verdict and the defendants have appealed.  It is alleged in the complaint that on February 6, 1927, the plaintiff, Donald Hunder, while whittling a piece of wood, pierced his left eye with the blade of a knife and thereby seriously injured such eye; that thereupon and on the same day the father and mother of said Donald Hunder took him to the defendants, who were practicing physicians and surgeons at Fargo, North Dakota, and em-

ployed them to treat the injured eye and give it such medical and surgical treatment as was necessary; that in pursuance of such employment the defendants immediately began treatment of the eye; that the parents of said Donald Hunder at said time placed him under the exclusive care and control of the defendants and relied entirely upon their judgment, care, skill and advice in treatment. It is further alleged:

"That thereafter the said defendants carelessly and negligently failed and omitted to diagnose said injury to said eye of said minor and failed and neglected to carefully investigate said injury and the nature or seriousness thereof as said defendants should promptly have done and negligently and carelessly failed to ascertain when they should have so done, that said left eye of said minor was so seriously injured, and that the nerves between that eye and said minor's right eye were endangered and that said minor was in imminent danger of losing the sight and vision of his other and right eye; that said left eye should have been promptly and carefully removed in order to prevent infection and injury to the nerves in said eye and the loss of sight and vision in the right eye of said minor.

"That while the said Donald was under the care of the defendants, their agents, servants and employees in said hospital, they failed to give him proper, ordinary or skillful attention, and made no effort to ascertain the extent of the injury which had been inflicted on Donald's left eye, and failed to diagnose the actual condition of the eye, and negligently and carelessly allowed several weeks to elapse from the time of the injury, during all of which time the said injured eye was greatly inflamed, which inflammation progressed from day to day, and became more acute and widespread, very soon resulting in sympathetic and acute inflammation in Donald's right eye, which, prior to that time was in every respect perfect.

"That the defendants wholly neglected and failed to diagnose the injured eye in the beginning or later along, and because of their failure in doing that, they either did not ascertain that it was so seriously injured that it should have been promptly removed in order to prevent inflammation and sympathetic irritation affecting the right eye, or if they did ascertain that fact, they carelessly, negligently and wilfully failed to properly treat and care for the injured eye and to remove the

same before inflammation extended and communicated therefrom to and through connecting nerves and tissues to Donald's right eye. . . .

"That the defendants were careless and negligent. in this, that from an examination of said injured eye it was clearly evident that the same should have been removed immediately that Donald was placed in their care, and that it was carelessness and negligence on their part not to remove the injured eye immediately, and it was gross carelessness and negligence on their part to permit said injured eye to become seriously inflamed and remain in that condition in the socket for weeks.

"That the sight of the injured eye was entirely destroyed by the knife thrust aforesaid. The knife blade had penetrated the eye to such an extent as to not only destroy its usefulness but to make it apparent to any physician of skill and understanding, that inflammation would immediately arise following the injury, and that such inflammation would inevitably and quickly communicate itself to the uninjured eye and destroy its usefulness.

"That it was not until March 19, 1927, that the defendants removed the injured eye. That when said injured eye was removed it was found that the same had been seriously infected for weeks before. That such inflammation had reached an acute stage and had theretofore communicated itself through nerves, blood vessels, cells, and other means to the right eye, which was also at that time seriously inflamed and involved.

"That as a result of the aforesaid carelessness of the defendants, and because of a complete failure on their part to properly treat and care for said injured eye and remove the same at the proper time, and to discover in the first instance the extent and gravity of the injury to the eye, inflammation in the injured eye communicated itself sympathetically and otherwise to the well eye, resulting in breaking down and destroying the blood vessels, nerve cells, tissues, and other vital parts of the said right eye, including the optic nerve, and totally destroying the same and its usefulness and rendering that eye totally blind."

The answer admitted the allegations of the complaint to the effect that William Hunder, the father of the plaintiff, was his duly appointed guardian; that the defendants are physicians and surgeons licensed and practicing as such at Fargo, North Dakota; and that the plaintiff injured his eye with a knife on February 6, 1927. Aside from these admissions the answer denied all the allegations of the complaint and

further alleged that any injuries plaintiff might have sustained were due wholly and proximately to his negligence and to the negligence of his parents. The case was tried to a jury upon the issues thus found; and, as said, resulted in a verdict in favor of the plaintiff.

On this appeal errors are specified and argued as follows: (1) The trial court erred in denying defendants' motion to dismiss the action, and defendants' motion for a directed verdict; (2) that the trial court erred in denying defendants' motion to withdraw from the jury certain evidence relating to medical treatment and to require the plaintiff to elect which of certain alleged grounds of negligence was relied upon for a recovery; (3) that the court erred in its instructions to the jury; (4) that the court erred in its rulings on the admission and rejection of evidence; and (5) misconduct of plaintiff's counsel.

1. Appellants lay especial stress upon, and devote a greater portion of their brief to an argument of, the first assignment of error. In short, it is contended by the defendants that the verdict has no substantial support in the evidence; that the evidence fails to show actionable negligence on the part of the defendant and that in any event the evidence fails to show that such negligence was the proximate cause of whatever injury the plaintiff may have sustained.

A great deal of evidence was adduced upon the trial. The record of the oral testimony transmitted to this court occupies some 1358 pages of typewritten transcript. So it is obviously impossible to even attempt to summarize in any detail the testimony of the different witnesses, and, in our opinion, this is not essential. It is undisputed that Donald Hunder injured his left eye on February 6, 1927 by piercing the eyeball with a knife with which he was whittling a piece of wood. The injury occurred at his uncle's farm near Beardsley, Minnesota. The plaintiff's parents immediately took him in an automobile some fourteen miles to one Dr. Oliver, a general practitioner, at Graceville, Minnesota. Dr. Oliver, who had been, and still was, ill, made an examination (although apparently not a very extended one) of the eye, applied some antiseptics, bandaged the eye and recommended that plaintiff be taken to an eye specialist and he further suggested or recommended that plaintiff's parents take him to defendants who are specialists in diseases of the eye, ear and nose, and were then practicing their profession at Fargo, North Dakota. The parents drove to Fargo and

arrived at the home of the defendants about eleven o'clock in the evening.

It is admitted by all parties that the defendants made some examination of the eye that evening and that some conversation was had both before and after the examination. There is, however, a square conflict as to what was said during such conversations. The plaintiff's mother testified:

"I told Dr. Rindlaub that Dr. Oliver had said that it was a very serious eye injury, because of the nature of the cut, that all that should be done was to remove that eye, and he says: I don't like to perform those operations, I have done them, and done them successfully, but I feel that is work for the specialist, so I am going to send you to a specialist. He should do the work."

The defendant, John Rindlaub, testified:

"I told them that where the wound was, it was through the colored part of the eye and into a zone that was more dangerous than even the clear part of the eye, and that the safer method would be to remove it. And then she wanted to know if there wasn't some other method to take care of it, and I told her, yes, that there was; that in the majority of cases such as that, by treating the eye, not only that eye, but the other eye would be saved, but I wanted to put the responsibility upon their shoulders. Q. You explained that to them, did you? A. Thoroughly."

. . .

"Q. Now, before you sent this boy to the hospital, or his mother and the boy to the hospital, was there any further conversation had? A. Yes sir.

Q. Well, what? A. Well, they—the mother objected to having the eye out.

Q. What did she say when you explained these two ways (either to remove the injured eye or to give it medical treatment and try to save both eyes) to her? A. She said that she wouldn't have the boy mutilated.

Q. Did Dr. Elizabeth say anything then? A. Dr. Elizabeth and I were both talking about the same time.

Q. Now, what did you say in answer to that? A. Well, I told her it was better to save one eye than to lose both.

Q. Well, did you say anything about the morning? A. Yes. I said

that—when she was very positive about it not coming out, I told her we would talk it over again in the morning."

The plaintiff's father and mother both denied that any conversation was had such as that testified to by the defendant, John Rindlaub.

It is undisputed that defendants arranged for a room in a hospital in Fargo and also arranged for the use of the operating room therein the next morning and that the plaintiff and his mother went to the hospital that evening. There is no dispute as to the nature of the operation that was performed the following morning. The eye was not removed but there was performed what is known as an iridectomy, that is, the part of the iris which protruded through the wound was cut off. The defendants both testified that the operation so performed was successful. There is, however, a square conflict in the testimony as to what was said that morning. The defendant, Dr. John Rindlaub, testified that on examining the eye that morning with an ophthalmoscope and other instruments evidence of sight was found. His version as to the conversation then had is as follows:

"We went over practically the same thing that we did the night before, and I remarked to Mrs. Hunder: Now, the thing for you to do is to decide what sort of treatment you want here. We want to take the eye out as a precautionary measure; but she said to me then: Well, if— have you ever had any cases like this where they have gotten well? And I told her, yes, we had had a great many; and then I said to her: Well, it is for you to decide. And she says: Well, I don't want my child—these aren't the exact words, but that is just the gist of the conversation. She said that she wouldn't have the eye taken out, but that she would take the responsibility. I told her that I wouldn't do anything, so far as anything excepting enucleation, unless she would take the responsibility."

This version of the conversation is denied in toto by the plaintiff's mother. She testified that nothing of the sort was said; that she expected them to remove the eye and that no conversation was had such as testified to by the defendant, John Rindlaub.

On Saturday, February 26, 1927, the plaintiff and his mother went to their home at Wheaton, Minnesota, returning to Fargo the following Monday. The plaintiff testified that this was with the consent, and at the suggestion of the defendant, Dr. John Rindlaub. He denied this.

He testified that the plaintiff's mother took the plaintiff to their home at Wheaton without his (Rindlaub's) knowledge and consent and after he had told her that she must not take the plaintiff away and that serious consequences might result if she did. The plaintiff continued under the treatment of the defendants until March 19, 1927, when he was again sent to the hospital and the left eye was removed. Again there is a square conflict in the testimony. The plaintiff's mother claims that she, during a number of days preceding the operation, repeatedly called the attention of the defendants to the bad condition, not only of plaintiff's left eye, but, of his right eye; that the right eye was badly inflamed; that it was sensitive to light and that he was unable to distinguish objects with it. This was all denied by the defendants. They claimed that the plaintiff's mother was at all times unwilling to have the left eye removed; that on the morning of March 19th, they observed evidence of "trouble" in the right eye. The defendant, John Rindlaub, testified as follows as regards his conversation then had with the plaintiff's mother:

"Then I had a talk with Mrs. Hunder, and I told her that the eye ought to come out; while there was only slight trouble in the other eye, that is the right eye, that I didn't want to take the responsibility any longer, and that I wanted that eye out; and if she didn't feel that it should come out, she was to have another doctor in to confirm what I had told her. And she said that she had confidence in me, and then I told her to call up her husband, and we sent the child to the hospital."

Defendants' version of the conversation immediately preceding the removal of the eye is contradicted by the plaintiff's mother. She testified:

"Q. Prior to the removal of that eye, did you have some talk with Dr. John about it?

"A. Yes, I think I almost had warfare with him for a whole week before it was removed."

She further testified that the plaintiff for a number of days had been running a temperature as high as 103.4; that the white part of the eyeball of the right eye was red and inflamed; that the eye continually teared or watered; that it was sensitive to light; that he was unable to see objects at any distance; that he had no appetite; that he was restless and didn't sleep well; that on calling his attention to the

eye, the defendant, John Rindlaub, told her that it was a cold or some medicine had come into the eye; that finally on March 19th after plaintiff had spent a sleepless night and was unable to tell whether the window shade was up she took the plaintiff to the offices of the defendants and demanded to see the defendant, John Rindlaub; that she told him at the time that the pupil in the eye did not dilate; that she had noticed this for the past two days; that thereupon the defendant, John Rindlaub, put some atropin in the eye saying that he would show her that the pupil would dilate; that after repeated efforts there was no dilation. That the defendant, John Rindlaub, thereafter "told me to send Donald from the room, he wanted to talk to me. And I asked him, is this a cold or medicine from the other eye? I told him I wanted my answer now. He says, the best thing we can do, we'll have to take that eye out as soon as we can. I asked him if he didn't think it was too late, but he didn't answer me. He says, we'll have to operate. I says, have I time to take Donald to the cities? Because I didn't want him to remove that eye, because I wanted some other specialist I could have faith in. Then he says, every minute counts, we should take that eye out as soon as possible. So he made arrangements. I called Mr. Hunder at Wheaton, and told him the conditions, and he came as soon as he could, but they had already performed the operation when he came there."

There is also a square conflict in the testimony as to the condition of the left eye at the time the plaintiff came under the care of the defendants as well as the condition of the eye interim the time the plaintiff came under defendants' care and, March 19th, when the eye was removed. According to the testimony of plaintiff's mother and father, and other witnesses for the plaintiff who were present at the time the injury occurred, or who saw the eye shortly thereafter, including Dr. Oliver, the eye was so severely injured that the eyeball had collapsed. According to their testimony not only had the substance denominated by the doctors as "aqueous" but the substance denominated as "vitreous" practically all escaped; and whatever difference of opinion there is among the medical experts they are all (including the defendants) agreed that if the eye was in the condition testified to by the mother, it should have been removed immediately. On this feature of the case we are unable to see how it can possibly be said as a matter of law

either that the defendants' or the plaintiff's version is correct. On the contrary, it seems to us that it was clearly a case for the jury to determine, under the evidence, what was the condition of the left eye at the time the defendants were placed in charge of the case. The same is also peculiarly true as regards the conversations had between the plaintiff's mother and the defendants. If the conversations were as the defendants claim, then, of course, they were not guilty of negligence in failing to remove the eye. On the other hand, if the conversations were as testified to by the plaintiff's mother, then it would seem that according to the testimony of the defendants themselves it cannot be said as a matter of law that they were free from negligence, as they admit, that even in the condition in which they claim they found the eye to be, it was safer to remove it and that good practice required that they inform the plaintiff's parents of the increased danger to the right eye if the left were not removed and that the responsibility for not removing the left eye must be assumed by the parents. It is true, as stated, the defendants claim that they did so advise the parents, and certainly according to their testimony they gave to the eye the best treatment of which they were capable. Nevertheless there was a decided conflict in the testimony upon these various phases of the case and it was for the jury to determine who told the truth. Accordingly we are all agreed that under the evidence in this case the question of defendants' negligence was for the jury.

Upon the oral argument it was earnestly insisted that in any event there was no evidence from which it reasonably could be deduced that the negligence of the defendants, if any, was the proximate cause of the injury sustained by the plaintiff. A careful consideration of all the evidence leads us to the conclusion that this contention is not well founded. At least one of the medical experts testified positively that in his opinion the failure to remove the left eye was responsible for the development of sympathetic ophthalmia in the right eye and that if the left eye had been removed immediately or within a week that in all probability the right eye would not have become involved; and one of the experts for the defendants stated that if the left eye was in the condition described by plaintiff's mother that it not only should have been removed promptly but that the failure to do so was probably responsible for the development of sympathetic ophthalmia in the other

eye. This testimony is rather in harmony with the views expressed by the defendants themselves in the testimony which we have quoted above. When the evidence is considered as a whole we are of the opinion that in this case the questions of negligence and contributory negligence and proximate cause were peculiarly questions for the determination of the jury.

2. At the close of the plaintiff's case, and again at the close of all the evidence, defendants' counsel moved that the plaintiff be required to elect as to whether or not he relied upon the charge that the defendants were negligent in failing to remove the left eye immediately; or upon the charge that the defendants were negligent in failing to properly treat the eye after they were placed in charge of the case. Upon the denial of this motion the defendants further moved that there be withdrawn from the consideration of the jury and stricken from the complaint any and all claims of negligence excepting only the single question whether the defendants were negligent in not immediately removing the left eye. Error is predicated upon the denial of these motions. In our opinion the rulings complained of were correct. As said, there was a square conflict in the testimony as to the condition of the left eye as well as plaintiff's general condition of health and to some extent as to the course of treatment interim the time plaintiff came under the care of defendants until the eye was removed. And, as has already been indicated, there was testimony tending to show that if the left eye had been removed within a week that the right eye probably would not have become involved.

The specific injury charged in this case was the loss of sight in the right eye. The basic question is whether the defendants were negligent in the treatment of the plaintiff during the time that the case was in their hands resulting in the loss of the sight in plaintiff's right eye. It is alleged in the complaint that the defendants were negligent in treating the injury to the left eye; that they were negligent in not removing such eye immediately; that they were negligent in their treatment after the plaintiff was placed under their care; that they negligently and carelessly allowed several weeks to elapse from the time of the injury, without removing the left eye "during all of which time the said injured eye was greatly inflamed which inflammation progressed from day to day and became more acute and widespread, very soon

resulting in sympathetic and acute inflammation in plaintiff's right eye." The different acts of alleged negligence did not constitute separate rights of action. There was but one basic injury and only one right of action. If any one act of alleged negligence or all acts taken together were such that reasonable men, in the exercise of reason and judgment, reasonably might draw the conclusion that the defendants were negligent and that such negligence resulted in the injury, then plaintiff had established a prima facie right of action, and was entitled to have the case submitted to the jury. He certainly was not required to predicate his cause upon any one single act of negligence and withdraw the others from the consideration of the jury.

3. It is next contended that the trial court erred in requiring the defendant John Rindlaub to be examined as an expert, while testifying under § 7870, Comp. Laws 1913 (which permits an adverse party to be called and examined as on cross-examination). The record discloses that the plaintiff first offered in evidence the deposition of Dr. Oliver. Dr. Oliver testified as regards the examination which he had made of the plaintiff's eye in the evening of February 6, 1927, and the condition then discovered by him; he further testified as an expert. He gave his opinion as regards the probability of infection resulting from the wound. He testified that in his opinion there was no sight in the eye,—although he admitted that his opinion was not final and he did not claim to be a specialist in injuries to or diseases of the eye. He did testify, however, that in his opinion the proper treatment of the eye would have been to remove it. The next witness called by the plaintiff was the assistant superintendent of the hospital where the plaintiff had been confined for treatment. Her testimony consisted solely of producing and identifying certain records of the hospital containing entries relating to plaintiff's case. The plaintiff next called the defendant, John Rindlaub, "for cross-examination under the statute as an adverse party." After the defendant had been examined at length as regards the hospital records and the entries thereon regarding the case, he was asked to explain various medical terms. Thereupon he was asked whether he had heard the testimony of Dr. Oliver as contained in the deposition. Upon answering this question in the affirmative he was asked if he had in mind that Dr. Oliver had testified that more or less of the contents of the eyeball had come out and that in his (Dr.

Oliver's) opinion the eye was blind, had lost sight, on that night, and that that was the only time that he (Dr. Oliver) had seen the boy's eye; that Dr. Oliver had testified that the cut in the eye extended through the pupil and outward and well into the white of the eye. Upon defendant answering these questions in the affirmative he was asked the following question:

"Q. Yes. If we assume that the testimony was true, that is, that this injury was to the pupil and outward into the white of the eye, as the doctor testified, and that more or less of the contents of the eyeball had come out, and that, in his opinion, the sight of the eye was destroyed; then what was the proper treatment for that eye?"

To this question defendants' counsel interposed an extended objection on the ground, among others, that the defendant having been called as an adverse party for cross-examination might not be required to testify as an expert. The record discloses that some argument was had as to the propriety of the question, some colloquy had between counsel and the court, whereupon the court announced that the objection was overruled. Defendants' counsel thereupon asked that the objection be deemed standing to all similar questions. The court stated that it would be so understood unless something new developed. The witness answered that it would depend a great deal upon the condition the eye was in and how much of the contents had come out. Plaintiff's counsel thereupon supplemented the former question with this question:

"All right. Now, if we assume that the injury to the eye was inflicted by the blade of a knife, that a large part of the contents of the eyeball had escaped, that the cut was through the pupil and well down into the white of the eye, and sight was destroyed, what then was the proper treatment?"

Defendants' counsel thereupon interposed an additional objection wherein the former grounds were re-stated at length. Plaintiff's counsel thereupon said:

"I'd like to make just one suggestion for the record. The evidence of the doctor fairly supports the question, but we are going to prove, in addition to that, as part of our evidence, sight was destroyed, that substantially all of the contents of the eyeball had escaped, that the injury was to the pupil and well down into the white of the eye; but

we cannot prove all of our case at one time. This is a defendant, I don't know of any reason why he should not want to answer these questions, anyway, as a general proposition. I think there is ample support in Dr. Oliver's testimony for the question, but if there is not, I am telling Your Honor we are going to prove those facts anyway."

Defendants' counsel thereupon retorted:

"Now, then, there is no issue here, if it pleases Your Honor, about this witness not being willing to answer these questions, etc."

Defendants' counsel proceeded further to give an argument or reasons why the objection should be sustained. At the close of such argument the trial court said:

"Oh, I think the rule would be different probably, if it were asked of an expert that really based his answer altogether upon the question, but Dr. Rindlaub knows the situation. He was the man that had the boy in his charge, and he may answer."

The defendant thereupon proceeded to give an answer wherein he attempted to refer to the condition found by him when he examined the eye. The plaintiff's counsel thereupon said:

"Your Honor, I submit that is improper. I move to strike that out. I didn't call for his experience with the case, I am just asking him an opinion based on an assumed state of facts, and if he is going to be permitted to go on and testify at random and has opinions different than involved in my question, I will have no alternative other than to withdraw the question, because I can't get it answered."

The trial court then said:

"Well, would you care to express an opinion, Doctor, upon the question submitted?"

The defendant then said:

"If the contents of the eye had almost all run out, why I should remove it."

Plaintiff's counsel thereupon said:

"Thank you, sir. It should have been removed at once, under these circumstances, that is, if the contents of the eye had substantially all run out?"

To which the defendant answered: "Yes."

At the time this examination was had the defendant Rindlaub had not been asked one question by plaintiff's counsel as regards the trans-

action in suit other than the questions based upon the hospital records. The defendant had not been asked or permitted to state the condition found by him on examining the eye; he had not been asked anything as regards what was said and done when plaintiff was brought to him for treatment.

It will be noted that plaintiff's counsel insisted that his questions did not call for defendant's "experience with the case" of the plaintiff, but that he (plaintiff's counsel) was "just asking him an opinion based on an assumed state of facts." It will also be noted that shortly before, the trial court had indicated that a different rule applied to the defendant from that applicable to an expert testifying upon an assumed state of facts, as the defendant "knew the situation. He was the man that had the boy in charge." Shortly before there was an intimation on the part of plaintiff's counsel that the defendant was refraining from answering proper questions; and there was also an intimation on the part of the trial court that the defendant might not care to give his opinion as regards the assumed case.

In our opinion § 7870, supra, was never intended to permit a party to an action to call an adverse party as an expert, examine him as such under the rules of cross-examination, and yet not be bound by the testimony. Osborn v. Carey, 24 Idaho, 158, 132 Pac. 967. Neither was it intended to change the order of proceedings in an action or reverse the order of proof. Boeck v. Boeck, 29 Idaho, 639, 161 Pac. 576.

We agree with the Supreme Court of Idaho: "The statute was not intended to enable an adverse party to call an opposing party as an expert and seek to establish his side of the case by such expert evidence. Where a witness is called under the provisions of that act, he may be examined by the adverse party as if under cross-examination, subject to the rules applicable to the examination of other witnesses, but it is contrary to the purpose and reason of that statute to allow the plaintiff to make out his case in chief by expert opinion evidence secured from the defendant on cross-examination. If the plaintiff desires to make his case by expert evidence from the defendant himself, he must call him as his own witness but is not permitted to do so under the provisions of that statute." Osborn v. Carey, 24 Idaho, 158, 168, 132 Pac. 967.

The purpose of the statute was to permit a party to an action to call the adverse party,—or, where a corporation is a party, a director,

officer, superintendent or managing agent thereof,—and to examine such party as regards some pertinent fact involved in the controversy. It was recognized that such party might, and probably would, possess knowledge pertinent to the inquiry; that such party probably would be an unwilling witness; and that his interests might, and probably would, be adversely affected by the testimony sought to be elicited; so it was provided that he might be examined under the rules of cross-examination, that is, subjected to leading questions, and that his testimony should not be binding upon the party calling him.

While the statute does not permit a party to an action or proceeding to call an adverse party thereto as an expert witness, yet, in many, if not most, cases, it probably would not be prejudicial to the substantial rights of the party who is so called. We are inclined to the view, however, that in light of the facts disclosed by the record in this case it cannot be said that the defendants were not prejudiced by the abuse of cross-examination. In this case expert testimony took a very important part. Both sides produced medical experts. It was obvious at the outset that expert testimony would play an important part. The first evidence adduced by the plaintiff consisted of the deposition of Dr. Oliver who testified both as regards his examination of the eye shortly after the injury and as an expert. Yet, the plaintiff was permitted, even before a prima facie case had been established, to call the defendant, John Rindlaub, and compel him to give his opinion as to proper treatment upon an assumed state of facts; but under a series of questions which embodied by specific designation the evidence of Dr. Oliver, including his examination, diagnosis and opinion as to the proper treatment that should have been given to the plaintiff.

4. During the opening statement of plaintiff's counsel to the jury, defendants' counsel objected to certain statements made therein. Thereupon the following colloquy was had:

"Plaintiff's Counsel: I want the court to understand our position. Anything we said to these defendants about the treatment of this boy's eyes is proper, anything we said to them and they said to us in response to it is proper, no matter where it came from.

"The Court: It is your claim that this statement was communicated to the defendants?

"Plaintiff's Counsel: Yes.

"The Court: I think you can mention that.

"Defendants' Counsel: It is still hearsay. A statement made by the doctor in Wheaton to Mrs. Hunder is hearsay as to us, and whether it is repeated to him or not, it is still hearsay, Your Honor.

"The Court: I think the idea is that it gives the defendants an idea of what the situation was, and consequently, whether it was of any value or not, that is a different proposition.

"Defendants' Counsel: Let the stenographer take the record of the statement, the statement already having been indicated, and let the record show that the defendants object to the statement and ask the court to exclude it as hearsay, improper to be shown in evidence, and an improper statement in the opening argument.

"The Court: Oh, he may make the statement. As I understand, it is a communication carried by the mother of the son to one of the defendant doctors.

"Plaintiff's Counsel: As I was saying to you when interrupted: I think it was on Thursday, Mrs. Hunder said to Dr. John Rindlaub, she was worried about the condition of the boy's eye, that it was growing inflamed and at that time, she said to him that her husband had reported to her the day before that the doctor at home had said that the eye should be removed, the sight was gone, because if it is not removed, it will result in the loss of the other eye. To this Dr. John remarked: small town stuff. Mrs. Hunder then said to him she was very much concerned about the eye, and he knew that she was relying upon him to give that eye proper care and attention. We will show you, gentlemen, that frequently, after that, Mrs. Hunder spoke to Dr. John about this situation. (The injured eye was becoming more and more inflamed, etc.)"

Thereafter during the course of the examination in chief of the plaintiff's mother testifying as a witness for the plaintiff, the following proceedings were had:

"Q. That evening you had a talk? A. Yes.

"Q. Where? A. Up in our room, where Donald was.

"Q. The room in the hospital? A. Yes.

"Q. Just you and he there? A. And Donald.

"Q. What talk did you have with him that night, if any, about the

eye? A. Well, our talk was in regard to what our physician in our own home town, the instructions—

"Q. Just state what you said to him, and he said to you. Repeat it exactly, as nearly as you can recall. A. I told him—

"Mr. Thorp: We object to any statement of what the physician had said to them that was not said to them in the presence of Dr. Rindlaub, as hearsay and prejudicial, and no foundation laid for it.

"The Court: She may answer whatever she told Dr. Rindlaub.

"Mr. Thorp: And irrelevant and immaterial.

"The Court: She may answer.

"A. I told Dr. John just what—I told Dr. John that Mr. Hunder had spoke to our family physician in Wheaton. This family physician had asked the condition of Donald's eye. He told him Mrs. Hunder—

"Mr. Thorp: That is objected to on the further ground that it is hearsay by two degrees, two steps.

"The Court: Well, let her answer.

"A. He said Mrs. Hunder, my wife, called me up yesterday, and said Donald's eye looked very bad, it was very red, and she was very worried, and wanted me to come up. This doctor said if that eye is very red and so inflamed, he says, take it out, or that one will be lost, and take the other one with it. That is the message that Mr. Hunder gave me when he came.

"Q. Did you tell Dr. Rindlaub that? A. Exactly, word for word.

"Q. What did he say to you? A. He said, oh, buckaroo. That was his by-word he always used. He says, small town stuff."

It is contended by the defendants that what the family physician in Wheaton (one Dr. Ewing, who so far as the evidence discloses had never seen the injured eye), may have said to plaintiff's father and he in turn may have said to plaintiff's mother, is hearsay as to the defendants and, hence, inadmissible even though she may have repeated these statements in a conversation with one of the defendants. The contention of the plaintiff, on the other hand, seems to be that it was proper for the plaintiff to show the whole of any conversation had between the plaintiff's mother and either of the defendants where the conversation itself in any manner referred to or involved the treatment of the plaintiff.

It is too clear for controversy that any statement Dr. Ewing may

have made to the plaintiff's father, or the plaintiff's father may have made to the plaintiff's mother, in the absence of the defendants is hearsay as to them and inadmissible unless the circumstances under which the statement was first made, or repeated to the defendants, were such as to bring it within some recognized exception to the hearsay rule. In cases like the present, a conversation becomes admissible only when it is shown to be a part of the res gestæ or because the statements in some manner have become admissions adverse to the interest of the party against whom they are sought to be proven.

Where one party to an action gives evidence of statements made by the opposite party in a conversation the opposite party sometimes becomes entitled to show other or further parts of the conversation which would not have been admissible in the first instance. 2 Jones, Commentaries on Ev. 2d ed. p. 1340.

"In such cases," says Jones (2 Jones, Commentaries on Ev. 2d ed. pp. 1342, 1343), "although a plaintiff may not, in the first instance, offer his own statements and thus make testimony in his own behalf, he may, if his statements are partially proved by the defendant's evidence, give the statement in full." This, however, does not mean that even in such cases the entire conversation may be shown. It is only so much of the conversation as is relevant, that is, only that which in any way explains or qualifies the part first given,—to the end that the jury may have before them the entire conversation so far as it relates to and is in some way connected with the statement proved. 2 Jones, Commentaries on Ev. pp. 1342, 1343; 1 Greenl. Ev. § 467. A party may not, under the guise of proving the remainder of a conversation, show utterances that are otherwise irrelevant and inadmissible. As regards the right of a party to show the whole of a conversation where the other party has introduced a part, Professor Wigmore says:

"In the definition of the limits of this right, there may be noted three general corollaries of the principle on which the right rests, namely; (a) No utterance irrelevant to the issue is receivable; (b) No more of the remainder of the utterance than concerns the same subject, and is explanatory of the first part, is receivable; (c) The remainder thus received merely aids in the construction of the utterance as a whole, and is not in itself testimony." (4 Wigmore, Ev. 2d ed. p. 509).

In this case the defendants had offered no evidence concerning the

alleged conversation. The testimony relating to it was offered as a part of plaintiff's main case.

Immediately prior to being interrogated regarding the conversation, plaintiff's mother had testified as regards the appearance of the injured eye; that the eye "looked like a piece of raw beefsteak, it was all red;" that "it got more red each day;" that because of her worry over the condition of the eye she had called her husband on the telephone and talked with him; that she had talked with the defendant Dr. Rindlaub in the forenoon of that same day regarding the injury, and told him that she and her husband were both worried "about Donald's condition, about the condition of that eyeball," and that Dr. Rindlaub answered: "everything is coming perfectly, very favorable."

Obviously the conversation in question here was not a part of the res gestæ. It is equally clear that the portion of the conversation relating to the statements claimed to have been made as regards the alleged statement of Dr. Ewing were in no way admissible as an admission against interest by the defendant Rindlaub. On the contrary they were self-serving statements favorable to the witness and to the plaintiff. (2 Jones, Commentaries on Ev. 2d ed. pp. 1636, et seq.; Crisp v. State Bank, 32 N. D. 263, 155 N. W. 78; Huston v. Johnson, 29 N. D. 546, 151 N. W. 774; Mulroy v. Jacobson, 24 N. D. 354, 139 N. W. 697; Johnston v. Spoonheim, 19 N. D. 191, 41 L.R.A.(N.S.) 901, 123 N. W. 830).

As indicated, there is a square conflict in the testimony between plaintiff's mother and the defendants as to the condition of the injured eye and also as regards the attitude of the plaintiff's mother and the defendants as regards the removal of such eye. The witness claimed that the conversation to which she testified occurred at the time when she called the attention of the defendant, John Rindlaub, to the inflamed and bad appearance of the injured eye. The alleged statement of Dr. Ewing was clearly incompetent as substantive evidence of the condition of the eye and it was error to permit it to be considered for this purpose. Materka v. Erie R. Co. 88 N. J. L. 372, 95 Atl. 612; Schmidt v. Stone, 50 N. D. 91, 103, 194 N. W. 917. It was equally inadmissible as corroborative of the testimony of the witness. 2 Jones, Ev. 2d ed. p. 1340. The hearsay character of the testimony was not altered by the fact that the witness may or may not have repeated

the statement in her conversation with the defendant Rindlaub. Sims v. Moore, 61 Iowa, 128, 16 N. W. 58.

We are aware of no rule rendering admissible the evidence as regards the statement of Dr. Ewing and plaintiff's father which plaintiff's mother claims to have related to one of the defendants in the circumstances shown here and respondent has failed to call our attention to a single authority justifying its admission. As we view it the testimony clearly falls within the rule inhibiting the admission of hearsay evidence. 3 Wigmore, Ev. 2d ed. pp. 2, et seq.; 3 Jones, Commentaries on Ev. pp. 1986, et seq.; 4 Chamberlayne, Ev. §§ 2708, et seq.; 22 C. J. pp. 199, et seq.; 10 R. C. L. pp. 958, 959; Huntley v. Geyer, 43 N. D. 366, 175 N. W. 619.

The jury must have been impressed with the importance of this hearsay evidence. It occupied a prominent place both in the opening statement and in the examination of Mrs. Hunder. In the opening statement plaintiff's counsel stated that Dr. Ewing said: "The eye should be removed, *the sight was gone,* because if it is not removed it will result in the loss of the other eye." Immediately prior thereto the trial court had stated that evidence might be introduced to prove the alleged statement of Dr. Ewing because it gave "the defendants an idea of what the situation was."

It seems too clear for controversy that if this evidence was incompetent, its admission was error prejudicial to the substantial rights of the defendants.

Error is also assigned upon the rulings made by the court during the examination of certain medical experts called by the plaintiff. Some of these assignments of error are predicated upon the examination of one Dr. Hall of Little Falls, Minnesota. There is no claim that Dr. Hall had made any examination of the plaintiff until at or shortly before the trial. He had no first-hand knowledge of the condition of the left eye or of the right eye until long after the left eye had been removed and sight had been lost in the right eye. His testimony was based upon the testimony which theretofore had been given by other witnesses or upon assumed facts. Before Dr. Hall testified there had been introduced in evidence the deposition of Dr. Oliver, the testimony of the assistant superintendent of the hospital, the cross-examination of Dr. John Rindlaub and the testimony of the

plaintiff's mother, Ethel Hunder. After having been examined at considerable length as regards the anatomy of the eye, Dr. Hall was questioned by plaintiff's counsel and returned answers as follows:

"Q. Doctor, at our request, did you make a physical examination of the eyes of little Donald Hunder? A. Well, I didn't make a thorough examination; that is, I mean any more than a casual—I looked at his eyes, and examined them somewhat, yes.

"Q. Did you make such an examination as, in your opinion, was necessary in order to qualify you to testify in this case? A. Yes sir. . . . (This is all the testimony as to the nature or extent of the examination.)

"Q. You have heard all of the testimony in this case, have you not? A. I heard the most of it, yes sir. I have heard—some has been a little indistinct, but I think I have heard the most of it.

"Q. You have been in the court room during the entire trial of the case? A. Yes.

"Q. So while every witness was on the stand, and every statement was being made, you have been sitting here listening? A. Yes. . . .

"Q. You heard the testimony here as to the extent of the injury, from the witness stand here, by Mrs. Hunder? A. Yes sir.

"Q. And also heard what Dr. Oliver had to say, by way of deposition? A. Yes sir.

"Q. And also heard what Dr. John Rindlaub said in cross examination? A. Yes sir."

The doctor was thereupon asked to give an opinion as to the extent of injury of the eyeball based upon such testimony. Defendants' counsel made objection and asked leave to examine the witness as a basis for the objection interposed. Leave was granted, and in the course of the examination Dr. Hall testified that in considering the premises on which he was required to answer he would take into consideration all the statements of Dr. Oliver in his deposition, including any statements therein, if any, which contradicted the statements of Mrs. Hunder. He was thereupon asked the following question:

"Q. Then, in giving your answer, it is necessary for you to determine which one of these witnesses is correct, in making the statement, when you assume the testimony of both of them, isn't it?"

Plaintiff's counsel interposed an objection to this question on the

ground that it was an improper question, which objection was sustained. At the close of the examination plaintiff's counsel withdrew the question to which the original objection had been interposed and proceeded to question Dr. Hall further as regards the anatomy of the eye and the likelihood of sympathetic ophthalmia resulting in the other eye where one of the eyes had received certain injuries. The following proceedings were thereupon had:

"Plaintiff's counsel: Doctor, from the evidence you have heard in this case, assuming it to be true, have you an opinion as to what extent the eye of Donald Hunder was involved in this injury? A. Yes sir.

"Q. What is that opinion?

Defendant's counsel: That is objected to upon the ground that it is an improper hypothetical question, requiring the witness to pass upon the effect of the testimony, wherein it is contradictory, does not agree, and to draw conclusions between the effect and credibility of the testimony, between Dr. Oliver and Mrs. Hunder, especially; and speculative and conjectural. And upon the further ground that the witness has not shown himself competent to testify.

"The Court: He may answer.

"A. From the evidence, and from the history of the case, I concluded that the boy did not see, did not have sight after the injury to the eye, to the left eye.

"Defendants' counsel: Now, then, we move to strike that out, for the reason that it is necessarily based upon the testimony of a lay witness, to the effect that the boy did not have sight, and is necessarily passing upon the credibility of that witness, and not an expert opinion.

"The Court: Well, I'll deny the motion."

We are of the opinion that the court erred in these rulings. The testimony called for and the answer given were inadmissible. A hypothetical question involves two distinct elements,—(1) the premise and (2) the inference or conclusion based upon the premise. The latter of necessity involves a consideration of the former and it is fundamental that "the tribunal must be furnished with the means of rejecting the latter if, upon consultation, they determine to reject the former, that is, of distinguishing conclusions properly founded from conclusions improperly founded." 1 Wigmore, Ev. 2d ed. p. 1079.

The hypothetical question and especially the answer made thereto purports to be based not only upon the evidence which the witness had heard, but the history of the case. The evidence consisted of the testimony of Dr. Oliver (including his expert testimony) ; the testimony of Dr. Rindlaub, including that part where he was required to testify as an expert in answer to hypothetical questions based in part upon the examination and diagnosis of Dr. Oliver and Dr. Oliver's opinion; including also the testimony of Mrs. Hunder as to what Dr. Ewing had said. While in certain cases, where the opinion of an expert itself, becomes, as it were, a fact in the case, such opinion may, in certain circumstances, be included as a basis for a hypothetical question propounded to another expert upon another and different state of facts, we are aware of no rule permitting an expert to base his opinion upon the opinion of another expert covering the precise question upon which the opinion is expressed. In his work on expert testimony Dean Rogers (Rogers, Expert Testimony, 2d ed. p. 74) says:

"It seems that it is not proper in asking hypothetical questions to incorporate in them the opinions of other expert witnesses. An opinion must rest upon fact, and cannot rest in whole or in part upon other opinions. This question was recently raised in the Supreme Court of Indiana, and the court laid down the law as above stated. It said: 'An opinion of an expert witness cannot be based upon opinions expressed by other experts. Facts, and not opinions, must be assumed in the questions. If it were otherwise, opinions might be built upon opinions of experts and the substantial facts driven out of the case.' And in a case recently decided in Maryland, that court said: 'Now, while an expert may give his opinion upon facts assumed to have been established, it would be against every rule and principle of evidence to allow him to state his opinion upon the conclusions and inferences of other witnesses.' "

The answer discloses that it was based not only upon the evidence that the witness had heard, but the history of the case. What that history was the evidence did not disclose. Elsewhere Dr. Hall testified that he had examined the boy's right eye at "the present time," and found it to be totally blind. He also testified (over objection) that in his opinion blindness was caused by infection from the left eye. The

following questions were thereupon propounded by plaintiff's counsel to which Dr. Hall made answer as follows:

"Plaintiff's counsel: The infection from the left eye. I will ask you whether or not you could tell, from an examination of the eye itself, that it was destroyed by infection? A. Well, with examining it, —you mean if I didn't know anything about the evidence, or the history?

"Q. The eye itself. A. Of course, I would base my opinion upon the history, I'd get that from the mother."

It is to be noted that Dr. Hall's testimony shows that he made some examination of the eye but nowhere did he testify as to the extent or nature of the examination he made. It does not appear whether the examination did or did not disclose anything on which the witness could or did base the opinion he expressed. Apparently he had received some history outside of what was disclosed by the evidence. Federal Betterment Co. v. Reeves, 73 Kan. 107, 4 L.R.A.(N.S.) 460, 84 Pac. 560; Osborn v. Carey, 24 Idaho, 158, 132 Pac. 967; Raub v. Carpenter, 187 U. S. 159, 47 L. ed. 119, 23 S. Ct. 72.

He was permitted to express an opinion based in part upon facts which were not disclosed to the jury, and which might not, and probably would not, have been a valid basis for an opinion. 22 C. J. p. 670; 3 Jones, Commentaries on Ev. 2d ed. pp. 2440, et seq.; Federal Betterment Co. v. Reeves, 73 Kan. 107, 4 L.R.A.(N.S.) 460, 84 Pac. 560, supra; Hintz v. Wagner, 25 N. D. 110, 140 N. W. 729.

One Dr. Rice was also called and examined as an expert witness on behalf of the plaintiff.

Dr. Rice testified at considerable length. His testimony occupies in all to exceed one hundred pages of the typewritten transcript. In answer to questions based upon the description which plaintiff's mother had given of the wound in the eye, the substances that appeared to have escaped therefrom, and the appearance of the eyeball, he gave his opinion as to the extent of the injury to the eye and the proper treatment for such injury. He stated that in his opinion the eye, in any event, should have been removed not later than a week or ten days after the injury. He testified that the symptoms and appearance of the eye (which plaintiff's mother stated appeared in the uninjured eye for some time before the injured eye was removed) indicated the

presence of sympathetic irritation in the well eye. He further testified that the injured eye should have been removed immediately upon such sympathetic irritation appearing in the uninjured eye because of the danger that sympathetic ophthalmia might develop, or, as he said, because the danger of sympathetic ophthalmia was too great. He also gave his opinion as to the manner or mode by which sympathetic ophthalmia might be transmitted to the uninjured eye.

Dr. Rice testified that he had never seen the plaintiff until after the left eye had been removed; that he saw him for the first time on March 15, 1928. He further testified:

"Q. And you examined his eye at that time, didn't you? A. Briefly personally.

"Q. Sufficiently so that you can tell about its condition to a certain extent? A. Yes sir."

During the direct examination plaintiff's counsel propounded the following question:

"Q. From the examination you made of this eye, coupled with the evidence that has been given in this case and assuming the evidence to be true on the part of the witnesses for the plaintiff, I will ask you if you have an opinion as to what caused the present condition of blindness in that eye, answer yes or no. A. Yes, I have.

"Q. What is that opinion?"

To this question an extended objection was interposed on the ground, among others, that it called for an opinion based upon contradictory testimony and that no proper foundation had been laid. The objection was overruled and the witnesss answered: "Sympathetic Ophthalmitis." A short colloquy followed in which counsel, the court, and the witness made statements and plaintiff's counsel thereupon asked the following question:

"Q. Have you an opinion from the evidence in this case assuming that to be true on the part of the plaintiff, and also taking your own examination of this eye into consideration then have you an opinion as to what caused the condition of blindness in the eye?"

To this question the same objection was interposed as to the prior question. The objection was overruled and the witness answered that he had an opinion and that in his opinion the blindness was caused

by ophthalmitis. These questions were clearly improper and the objections should have been sustained. They are violative of the rule announced by this court in Kinney v. Brotherhood of American Yeomen, 15 N. D. 21, 106 N. W. 44; and Pyke v. Jamestown, 15 N. D. 157, 107 N. W. 359. In the latter case this court said:

"A physician may, in testifying as an expert, give his opinion upon facts resting in his own knowledge, or upon facts testified to by other witnesses, but, in the former as well as the latter case, the facts upon which the opinion is based must appear in the evidence. The rule is that such questions must be based upon facts previously stated by the witness, or upon facts testified to by others, or upon facts agreed to, or assumed as true hypothetically. The rule must be adhered to, for otherwise there is no basis upon which the jury can measure the value of the opinion." See also Hitchcock v. Burgett, 38 Mich. 501; Raub v. Carpenter, 187 U. S. 159, 47 L. ed. 119, 23 S. Ct. 72; 3 Jones, Commentaries on Ev. 2d ed. § 1334.

The other errors assigned are not likely to occur upon another trial and, hence, need not be considered.

In view of another trial we deem it proper to observe that while the form of hypothetical questions adopted in this case, that is, questions based upon the testimony heard instead of upon an assumed state of facts has been held permissive where there is no conflict in the evidence so heard and upon which the question is based, it has nevertheless been held that even in these circumstances this form of question is not to be commended. Walters v. Rock, 18 N. D. 45, 54, 115 N. W. 515. See also Anderson v. Jacobson, 42 N. D. 87, 172 N. W. 64. And this form of questioning is never permissive where there is a conflict or material inconsistencies or discrepancies in regard to matters upon which the opinion of the expert must be based. 3 Jones, Commentaries on Ev. 2d ed. p. 2433. Questions calling for expert opinions should be framed so as not to call upon the witnesses to pass upon the credibility of witnesses, the preponderance of evidence, or determine controverted questions of fact. 3 Jones, Commentaries on Ev. 2d ed. § 1321.

It follows from what has been said that the defendants did not receive that fair trial to which they are entitled under our laws.

. The judgment and order appealed from are reversed and a new trial ordered.

BURKE, BIRDZELL, NUESSLE and BURR, JJ., concur.