In the Matter of the ESTATE of H. W. HENDRICKS, Deceased.

H. A. PORTER, Petitioner and Appellant,

v.

William Loring HENDRICKS, Blanche Hendricks Todd, Kenneth Morton Hendricks, Ralph Hendricks, Minot Federal Savings and Loan Association, Dakota Boys Ranch Association, and all other persons unknown interested in the estate of H. W. Hendricks, a/k/a Hiram Wesley Hendricks, deceased, Respondent and Appellees.

No. 7886.

Supreme Court of North Dakota.

Aug. 24, 1961.

Murray & Rosenberg, Bismarck, for petitioner and appellant.

A. J. Pederson, Kenmare, and McGee & Van Sickle, Minot, for respondents and appellees.

BURKE, Judge.

H. W. Hendricks died on January 10, 1959. On January 12, 1959, H. A. Porter filed a petition for the probate of a purported will of the deceased. Under the terms of this purported will Porter was the principal devisee and legatee.

The heirs at law of the testator filed objections to the probate of the will upon two grounds; first, that the testator was mentally incompetent to make a will, and second, that the testator was induced to make the will by undue influence upon the part of Porter. The county court denied the probate of the will upon the ground that it had been procured by undue influence. Upon appeal from the order of the county court, the issues were tried de novo before a jury in district court. Upon such trial, the trial judge required separate findings by the jury upon the issues of mental capacity and undue influence. The jury returned a verdict finding that the testator was mentally competent to make a will but that the will had been procured by undue influence. Pursuant to this verdict, judgment was entered decreeing that the will presented by Porter for probate was not the will of H. W. Hendricks. This appeal is from the judgment. The only issue here is whether the evidence is sufficient to sustain the verdict.

Dr. Porter was a rolling stone with many facets. He had been a farmer, typist, bank clerk, plumber, printer, reporter, school teacher, photographer and finally a chiropractor. He estimated that he had held 120 different jobs and had worked in 14 states. He came to Kenmare, N. D., in June 1956, and opened an office for the practice of chiropractic. At that time he was 59 years of age. He first met H. W. Hendricks when Hendricks came to his office for treatment on February 4, 1957. At that time Mr. Hendricks was 81 years of age. He was a recluse who had lived for many years in a small house on the outskirts of Kenmare. As a young man he had lived in the Kenmare area and had acquired a quarter section of land. About 1909 he went to Iowa for the purpose of getting married and settled there. His first child, William, was born in 1911. Two additional children were born prior to the separation of their parents in 1921 and a fourth child was born subsequent to the separation. William Hendricks, a son, in his testimony, surmised that his mother left his father because of the fact that the father was a poor provider and was 15 years older than his mother. He said: "Mother just picked up and left and we moved to Danville, Illinois."

In so far as the record shows there was no contact whatever between the father and his family between 1921 and 1931. At some time during that interval the father had returned to Kenmare and commenced farming his quarter section of land. In what manner communications with the family were reestablished is not clear, but William the eldest son visited his father for a few months in 1931. After William left, there were no further contacts between the father and his children until 1948, when the father visited his son, Kenneth, and a daughter who lived in Phoenix, Arizona. About the same time the father commenced a correspondence with William who had moved to California. The father visited again in Phoenix in 1950. It is clear that the correspondence between the father and his children was desultory on the part of the children. Kenneth did not write his father at all after 1956 or 1957, and although William stated that his correspondence with his father continued until December 1958, his proof consisted wholly of letters the father had written him and he did not testify as to any recent letters he had written to his father.

The father had rented his farm to a neighbor and moved to a small house at the

outskirts of Kenmare about 1938. Sometime later he moved to another small house, also on the outskirts of Kenmare where he lived until he died. From 1921 to 1959, when he died, or for a period of 38 years, he lived alone. He was not neat in his personal appearance nor in the maintenance of his home and grounds. He was frugal to the point of being miserly, yet he made several extended trips, in addition to those made to visit his children, to Canada, to Hawaii and to Florida. He was considered somewhat eccentric by many of the people of Kenmare and he had almost no friends. He came into town almost every day and stopped at a filling station where he could visit with a few other people who usually gathered there. He complained constantly about the fact that his children did not write or visit him. He was a lonely old man who felt deeply that he was being neglected.

From the very beginning of his professional association with Mr. Hendricks, Dr. Porter treated him with consideration and kindness. In addition to the professional attention he gave him, he performed many other services for him. Each day Hendricks came into town, Dr. Porter drove him home after his office hours. He wrote many letters for him. He helped him care for his chickens, gather feed for them, and when Hendricks decided to get rid of his chickens, Dr. Porter helped him sell them. Whenever Hendricks called him, Dr. Porter went to his home. Many times during the winter he had to shovel a path through the snow in order to get into the house. These trips were distasteful to the doctor, not because the place was unclean but because of an odor which he attributed to rats and mice. Many times Dr. Porter helped Hendricks tidy up his home and he bought and spread poison in an attempt to rid the house of vermin. On these visits Dr. Porter also gave Hendricks many treatments or "semi-treatments" as he called them. He testified "I think I was with him on an average of 4, or 5 days out of each week, usually gave him a little tap, sometimes only a min-

ute, sometimes three, sometimes five, but he always liked it and he was very appreciative that somebody would give him that treatment on his head and neck and massage him".

According to Dr. Porter the first time Hendricks mentioned a will to him was in conversations they had in August 1957, or about 6 months after they had met. In the first of these conversations Hendricks complained that his eldest son had refused to come and see him unless he would send him $600 to buy a used car. In a conversation about a week later Hendricks said: "I'm sure there's no hope any of my children will come to see me, I am figuring on making out the will to you, but I will play along with them a little longer." Dr. Porter then asked: "Do you mean that all I have to do to get this is to keep on tending you like I have been?" Hendricks replied: "That's right nobody else is doing it, I'm going to play along with this oldest son to see if he will make good, but what I do for him depends on what he does for me."

Prior to these conversations Hendricks had executed several wills. While in Canada he made a will naming his children as beneficiaries. In 1952 he made a will leaving all of his property to the School for the Crippled Children at Jamestown. In 1955, he made another will devising the bulk of his property to the Dakota Boys Ranch located near Tolley, with some small bequests to his children. In 1956, he again willed his property to his children.

Later in August 1957, according to Porter, Hendricks, while visiting with him, said: "We might as well make out a scrap will." By the term "scrap will" Hendricks meant a rough draft of a proposed will. Using the 1956 will as a model Porter prepared a rough draft leaving a blank space for naming the principal beneficiary. When this was completed Hendricks said: "I'm going to Tampa, Florida but I am going to see if this one son will visit in Florida before I make up my mind on how I will complete this will, but I will let you know."

In November 1957, Hendricks left for Florida where he spent most of the winter. During his absence he and Porter carried on a regular weekly correspondence. In December Hendricks wrote to Porter: "I have no intention of favoring the Dakota Boys Ranch. I am giving children each $50.00 I don't get a scratch from them only I may do different if he comes here." Hendricks returned to Kenmare about the middle of February 1958, and he and Porter resumed their friendly associations and doctor and patient relationship.

Dr. Porter testified that Hendricks came to his office on June 18, 1958, and directed him to prepare a will, bequeathing the bulk of his estate to Porter. According to Porter, Hendricks said: "My relatives have deserted me and they don't deserve a damn cent * * *. I'm giving it to you because you have been taking care of me all of the time." The will was then prepared by Porter and he and Hendricks together took the will to C. D. Anderson's garage. There they picked up Mr. Anderson and went to Nordstrom's market. At the market, Hendricks told Anderson and Nordstrom that he wanted to change his will and that he wanted them to be witnesses to the new will. Dr. Porter then read the will to all of them. After the reading, Hendricks signed as testator and Anderson and Nordstrom signed as witnesses. The will was then taken back to Dr. Porter's office where it remained until Hendricks died six months later. During the last six months of Hendrick's life, Dr. Porter continued to befriend him and none of Hendrick's children came to see him.

█ It is undisputed that at all times during Dr. Porter's relationship with Mr. Hendricks a relationship of chiropractor and patient existed. Ordinarily the relationship of physician and patient is held to be a confidential relationship as a matter of law. It is "one of trust and confidence and the utmost good faith must be exercised not only in professional matters but in all other relations between the parties." 70

C.J.S. Physicians and Surgeons § 36, p. 941; 41 Am.Jur. (Physicians and Surgeons, Sec. 74) 196. It is urged here that the rule applicable to physician and patient applies equally to chiropractor and patient because the reasons which give rise to the rule with respect to physicians apply with equal force to chiropractors. In this case, however, it is unnecessary for us to decide this specific issue. In instructing the jury in this case, the trial judge submitted the issue as to whether a confidential relationship existed, as a question of fact, to be decided upon all the evidence in the case. We are satisfied that the evidence, as outlined above, was sufficient to warrant a finding that a confidential relationship existed between Dr. Porter and Mr. Hendricks, even though such confidential relationship did not necessarily arise as a matter of law. In Stormon v. Weiss, N.D., 65 N.W.2d 475, we had occasion to consider a situation where a person in a confidential relationship with a testatrix, drew a will for the testatrix, disinheriting relatives who would ordinarily have been the recipients of the testatrix's bounty and making himself the principal beneficiary under the will, and where the drawer of the will kept it in his possession until the death of the testatrix. In that case, after an extended consideration, we reached the conclusion that the stated circumstances gave rise to an inference of undue influence and cast upon the proponent of the will the burden of going forward with the evidence to overcome this inference. We also held that, where the only evidence in the case to combat the inference of undue influence was the uncorroborated testimony of the proponent of the will, the question of the credibility of such testimony was for the jury, and that the jury was not bound to accept such testimony, even though it was uncontradicted, as against the inference.

█ There is no legal basis for distinguishing the instant case from Stormon v. Weiss, supra. What differences exist between the two cases are immaterial. In each case a person in a confidential relation-

ship with the testator drew the will. He was made the principal beneficiary of the will, to the exclusion of relatives of the testator and he retained the will in his possession from the time of its execution until the death of the testator. These are the basic facts which give rise to the inference of undue influence. Also in the instant case the only evidence in the case to rebut the inference of undue influence was the testimony of the proponent of, and the principal beneficiary under, the will. Under the rule laid down in Stormon v. Weiss, supra, the jury might reject this testimony and accept the inference of undue influence. The evidence was therefore sufficient to sustain the verdict and judgment in this case. The judgment is therefore affirmed.

█ Since in the case of Hendricks v. Porter, 110 N.W.2d 421, which in a sense is a companion to the instant case, we have reversed a judgment of the district court which held that a deed executed and delivered by Hendricks to Porter was obtained by undue influence, some additional comment should be made. At first blush it may seem that the two decisions are conflicting. However, the will case was tried to a jury. Upon an appeal from a case tried to a jury, our review of the facts is limited to a consideration of whether there is substantial evidence to sustain the verdict. If there is such evidence, we are bound by the verdict.

On the other hand, the case with respect to the deed was an action to quiet title, a court case. Upon an appeal in such a case, the appellant, if he demands it, as he did here, is entitled to a trial de novo, upon all issues. Upon such trial the trial judge's findings, while entitled to appreciable weight, are not binding on this court. Upon the appeal in the action to quiet title it was our duty to try the facts upon the record presented. We did so and reached a conclusion that the execution of the deed was not tainted by undue influence.

SATHRE, C. J., and MORRIS, STRUTZ and TEIGEN, JJ., concur.