Caroline **LEMBKE,** and Jeanette **Waxvik,** Guardian ad litem of Kenneth Lembke and Gloria Lembke, Minors, Plaintiffs and Appellants in the District Court, Respondents in the Supreme Court,

v.

Clara **UNKE** et al., and Harry Carlson, as Special Guardian of Gloria Lembke, Kenneth Lembke, Jerry Lembke, Louise Lembke, Odean Lembke, Dennis Lembke, Rodney Lembke, Wayne Stegman, William Lembke, and Raymond Lembke, Minors, Defendants and Respondents in the District Court,

Elsie Stegman, Walter Lembke, Leonard Lembke, and Clara Unke, Individually and as Executrix of the Will of Louis Lembke, Deceased, Appellants in the Supreme Court.

No. 8486.

Supreme Court of North Dakota.

Oct. 27, 1969.

Rehearing Denied Nov. 26, 1969.

Ringsak & Webb, Grafton, for appellants.

Nelson & Mack, Grand Forks, for respondents.

ERICKSTAD, Judge (On Reassignment).

Clara Unke (individually and as executrix of the will of Louis Lembke, deceased), Elsie Stegman, Walter Lembke, and Leonard Lembke, children of the first marriage of Louis Lembke, appeal from a judgment of the District Court of Pembina County dated January 13, 1967, and also from an order dated July 27, 1967, denying their motion for judgment notwithstanding the verdict or in the alternative for a new trial.

On January 19, 1966, Clara Unke filed a petition in the County Court of Pembina County stating that Louis died on January 11, 1966, at Drayton, North Dakota, and praying the court to issue to her letters testamentary as executrix pursuant to the terms of his last will and testament dated January 6, 1966.

On February 14, 1966, Caroline Lembke, Louis's second wife, filed with the same court an objection to the admission of the instrument dated January 6, 1966, as Louis's last will and testament. Attached to the written objection was a photocopy of an instrument dated June 7, 1955, alleged to be Louis's last will and testament. The terms of the 1955 document were much more favorable to Caroline and the two children born the issue of her marriage to Louis than were the terms of the 1966 instrument.

After due hearing the county court rejected Caroline's objection and admitted the 1966 instrument as Louis's last will and testament.

The order of the county court dated February 6, 1966, admitting the 1966 document as Louis's last will and testament, was appealed to the District Court of Pembina County, where a trial de novo was demanded. The district court called a jury to hear the case; and at the completion of the trial, in giving its instructions, the court submitted to the jury a form of special verdict which required the jury to answer three questions. Those questions and the jury's answers follow:

(1) Is Exhibit # 1 the valid Last Will and Testament of Louis Lembke, deceased, and entitled to probate as such? ANSWER No.

(Note. If your answer to the above Question No. 1 be "yes," it will not be necessary for the Jury to answer the remaining two questions; but if your answer to the above Question No. 1 be "no," you will proceed to answer each of the remaining questions.)

(2) Did Louis Lembke, presently deceased, at the time of the making the Last Will and Testament, Exhibit #1, possess testamentary capacity? ANSWER No.

(3) Was the making of Exhibit # 1, the purported Last Will and Testament Louis Lembke the result of undue influence then exercised upon him by others? ANSWER No.

Following the rendition of that verdict on November 18, 1966, the children and descendants of children of Louis's first marriage and the executrix of the contested will made a motion dated November 25, 1966, for judgment notwithstanding the verdict or in the alternative for a new trial. It is from the order denying that motion, dated July 27, 1967, that the appeal is taken. Although the notice of appeal asserts that the appeal is also from the judgment, the appellants' briefs cover only the appeal from the order denying the motion.

We shall hereafter refer to the appellants in this court as the first family and to Car-

oline and the children of the second marriage as the second family.

The first family, in appealing to this court, have set forth seven specifications of error; but as they have chosen to group the specifications of error into five issues, we shall consider this appeal on the basis of the issues rather than on the specifications of error and shall deem all specifications of error not covered in the issues and not argued in the briefs, abandoned. See Regent Cooperative Equity Exchange v. Johnston's Fuel Liners, 122 N.W.2d 151 (N.D.1963), Syllabus 4.

The first issue is whether the court erred in permitting the testator's attending physician to give his opinion as to Louis's testamentary capacity. The appellants contend that in permitting the doctor to give his opinion concerning Louis's mental capacity to make a will, N.D.C.C. § 31–01–06(3) was violated. That subsection reads:

A physician or surgeon, without the consent of his patient, cannot be examined as to any information acquired in attending the patient or as to any communication made by the patient to him in the course of professional employment;

North Dakota Century Code.

That part of the transcript pertinent to this issue follows:

Q. Dr. Meredith, can you tell us whether or not in your opinion the late Mr. Louis Lembke had sufficient mental capacity to make a will, to know the disposition he was making of his property and the beneficiaries on the exact date that you received these two requests from Mrs. Clara Unke and Attorney William DePuy?

\* \* \* \* \* \*

A. I have an opinion, yes.

Q. What is that opinion?

\* \* \* \* \* \*

A. Well, I felt he was too cloudy on that day. He was a near terminal. I certainly did not feel he was in any condition to draw up a will or think about property. Poor man was dying.

The trial court, in permitting the physician to testify, quoted with approval the following passage:

In contests over the validity of a will, where both sides—the executor on the one hand and the heirs or next of kin on the other—claim under and not adversely to the decedent, the assumption should prevail that the decedent would desire that the validity of his will should be determined in the fullest light of the facts. Accordingly in this situation either the executor or the contestants may effectively waive the privilege without the concurrence of the other. (footnotes omitted)

C. McCormick, Law of Evidence § 105, at 217 (1954).

Applying that reasoning, the trial court rejected the rule applied in respect to that question in Auld v. Cathro, 20 N.D. 461, 128 N.W. 1025, 32 L.R.A.,N.S., 71 (1910).

If it were the sole purpose of this court to decide today's controversies in light of its earlier decisions, much of our work could be taken over, after proper programming, by a computer, and in this instance our labor would end by applying the 1910 decision to the facts of this case. Such an application would require the granting of a new trial.

In *Auld*, in construing the predecessor of the present statute (which, for the purposes of this issue, was quite similar), this court said:

" \* \* \* It provides that the physician shall not be compelled to disclose any information, etc., acquired in his confidential relations with his patient. For whose benefit was this provision intended? Clearly, for the benefit of the patient, whose interests, reputation, and sensibilities may be injured and grossly outraged by its disclosure. The fact that

the physician acquired the information in order to prescribe for or treat the patient cannot affect the physician in the least degree unfavorably, nor that he should be compelled to disclose as a witness the information or knowledge thus acquired. The object of the section, therefore, was to protect the patient, to whom protection was so important, and not the physician, to whom it was quite unimportant, from the consequences of such disclosure, and shows that the provision that the physician shall not be compelled to make the disclosure as a witness renders the statement of the patient privileged as to him and that this was within the intention of the makers of the statute clearly implied from [its] language, and that it should not be disclosed by the physician without his consent."

Auld v. Cathro, 20 N.D. 461, 128 N.W. 1025, 1029 (1910), quoting Boyle v. N. W. Mutual Relief Ass'n, 95 Wis. 312, 70 N.W. 351, 354–355 (1897).

That this court believed that heirs of the decedent could not waive the privilege is also obvious from the approving way in which it quoted the Supreme Court of Wisconsin in In re Hunt's Will, 122 Wis. 460, 100 N.W. 874 (1904), when the Wisconsin court referred to what it had said in In re Bruendl's Will, 102 Wis. 45, 78 N.W. 169 (1899):

" * * * In Re Bruendl's Will, supra, right of waiver was contended for in behalf of the heirs of the decedent, who offered the physician's testimony, and the whole subject was argued and considered fully, whereupon it was said: 'The Legislature has decided wisely that public policy requires such measure of restriction upon the freedom of the physician to testify or of others to demand testimony.' While the decision in this case turned on other considerations, the above remark was made with deliberation, and in response to full discussion. We adhere to that view, and hold that no one, save the patient himself, can effectively consent to withdrawal of this mantle of secrecy which the statute has cast about the information which the physician needfully acquired in and for professional treatment."

Auld v. Cathro, *supra*, 128 N.W., at p. 1030, quoting In re Hunt's Will, *supra*, 100 N.W., at p. 876.

As we do not see our function as limited to deciding today's controversies in light only of yesterday's opinions, and as our legislature has not spoken on this issue, we believe the advice which the legislature gives us generally must guide us in this case. Pertinent are N.D.C.C. §§ 1–01–03, 1–01–04, 1–01–05, and 1–01–06, which read:

1–01–03. Expression of law.—The will of the sovereign power is expressed by:

1. The constitution of the United States;

2. Treaties made under the authority of the United States;

3. Statutes enacted by the Congress of the United States;

4. The constitution of the state;

5. The statutes of the state;

6. The ordinances of other and subordinate legislative bodies; and

7. The decisions of the tribunals enforcing those rules, which, though not enacted, form what is known as customary or common law.

1–01–04. Common law divided.—The common law is divided into:

1. Public law, or the law of nations; and

2. Domestic or municipal law.

1–01–05. Evidence of common law.—The evidence of the common law is found in the decisions of the tribunals.

1–01–06. Code excludes common law.—In this state there is no common law in any case where the law is declared by the code.

North Dakota Century Code.

As none of the subsections 1 through 6 of § 1–01–03 provides us with the answer in the instant case, we believe that we are required to determine from the common law whether those regarded as standing in the place of the testator or representing him may waive the physician-patient privilege after the patient's death.

In determining the common law of this state we are not restricted to the law as it has evolved over the centuries in England. The common law, which is based on reason and public policy, can best be determined by studying the decisions of our federal and state courts and the writings of past and present students of our country's law over all the years of American judicial history. This is not to say that help in determining the common law may not be found by studying the ancient law of England, but we are in no wise limited to such a study for a determination of the common law of North Dakota.

■ A decision often referred to by the courts of this country in recent years in defining common law is that of Funk v. United States, 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369, 93 A.L.R. 1136 (1933). In *Funk* Justice Sutherland, speaking for the majority, first quoted another decision of the United States Supreme Court, Hurtado v. California, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884), and then summarized the majority's view of the meaning of the common law as follows:

"It is more consonant to the true philosophy of our historical legal institutions to say that the spirit of personal liberty and individual right, which they embodied, was preserved and developed by a progressive growth and wise adaptation to new circumstances and situations of the forms and processes found fit to give, from time to time, new expression and greater effect to modern ideas of self-government.

"This flexibility and capacity for growth and adaptation is the peculiar boast and excellence of the common law. * * * And as it was the characteristic principle of the common law to draw its inspiration from every fountain of justice, we are not to assume that the sources of its supply have been exhausted. On the contrary, we should expect that the new and various experiences of our own situation and system will mould and shape it into new and not less useful forms." (quoting *Hurtado*)

\* \* \* \* \* \*

To concede this capacity for growth and change in the common law by drawing "its inspiration from every fountain of justice," and at the same time to say that the courts of this country are forever bound to perpetuate such of its rules as, by every reasonable test, are found to be neither wise nor just, because we have once adopted them as suited to our situation and institutions at a particular time, is to deny to the common law in the place of its adoption a "flexibility and capacity for growth and adaptation" which was "the peculiar boast and excellence" of the system in the place of its origin.

\* \* \* It has been said so often as to have become axiomatic that the common law is not immutable but flexible, and by its own principles adapts itself to varying conditions. \* \* \*

Funk v. United States, *supra*, 54 S.Ct. 212, 215–216.

As in Justice Sutherland's day, the successful development of the truth should be our objective:

The fundamental basis upon which all rules of evidence must rest—if they are to rest upon reason—is their adaptation to the successful development of the truth. And, since experience is of all teachers the most dependable, and since experience also is a continuous process, it follows that a rule of evidence at one time thought necessary to the ascertain-

ment of truth should yield to the experience of a succeeding generation whenever that experience has clearly demonstrated the fallacy or unwisdom of the old rule.

Funk v. United States, *supra,* 54 S.Ct. 212, 215.

In abrogating the old rule which excluded a wife from testifying for her husband in a criminal case, the court found two of its previous decisions to be out of harmony with other decisions of the Court and with the views expressed in *Funk* and accordingly expressly overruled those two decisions in respect to that rule.

As we have previously said, since 1933 many courts have quoted Justice Sutherland and have used the same reasoning that he relied on in bringing the Court to its decision.

One of the more recent appellate court decisions relying on *Funk* is that of Howarth v. Pfeifer, Alaska, 443 P.2d 39 (1968). Lest it be argued that we are governed by the common law of England in ascertaining our common law, we quote the following passage from that case and adopt its view:

Another aspect of appellee's argument that should not pass unnoticed is that AS 01.10.010, which makes the common law applicable in Alaska, refers to the common law of England. It should be noted here that we have the common law of the United States now, some of which is over 300 years old. The ancient common law of England is not controlling over the developing common law of our own country. (footnote omitted)

Howarth v. Pfeifer, *supra,* 44.

In a 1962 decision the Supreme Court of Kansas relied on Justice Holmes and Justice Cardozo in expressing the meaning of common law:

One of the basic characteristics of the common law is that it is not static, but is endowed with vitality and a capacity to grow. It never becomes permanently crystalized but changes and adjusts from time to time to new developments in social and economic life to meet the changing needs of a complex society. In a sense, it must be behind the times, because before the law changes or develops new rules, the conditions requiring the modification must acquire some degree of permanency (Justice Holmes, Collected Legal Papers, p. 294). Modification implies growth. It is the life of the law. In his book entitled The Growth of the Law, page 20, Mr. Justice Cardozo, with poetic imagery, gave the following expression to that thought:

" * * * The inn that shelters for the night is not the journey's end. The law, like the traveler, must be ready for the morrow. It must have a principle of growth."

Hoffman v. Dautel, 189 Kan. 165, 368 P. 2d 57, 59 (1962).

Ninety years ago Oliver Wendell Holmes emphasized the importance of public policy in shaping the common law:

Every important principle which is developed by litigation is in fact and at bottom the result of more or less definitely understood views of public policy; most generally, to be sure, under our practice and traditions, the unconscious result of instinctive preferences and inarticulate convictions, but none the less traceable to public policy in the last analysis. And as the law is administered by able and experienced men, who know too much to sacrifice good sense to a syllogism, it will be found that when ancient rules maintain themselves in this way, new reasons more fitted to the time have been found for them, and that they gradually receive a new content and at last a new form from the grounds to which they have been transplanted. The importance of tracing the process lies in the fact that it is unconscious, and involves the attempt to follow precedents, as well as to give a good reason for them, and that hence, if it can be shown

that one half of the effort has failed, we are at liberty to consider the question of policy with a freedom that was not possible before. (footnote omitted)

Holmes, Common Carriers and the Common Law, 13 Am.L.Rev. 609, 631 (1879).

In discussing the common law, the Court of Appeals of Ohio has had this to say:

The common law is not static; it must change for the benefit of mankind when the need for a change presents itself. This is the beauty of the law. It must be ready to control the actions of men in their immediate time and age. A law which is outdated gives justice to no one.

Teramano v. Teramano, 1 Ohio App.2d 504, 205 N.E.2d 586, 590 (1965).

One of the finest dissertations on the common law, which contains within it the views of eminent legal scholars, may be found in State v. Culver, 23 N.J. 495, 129 A.2d 715 (1957), an opinion written by Chief Justice Vanderbilt:

One of the great virtues of the common law is its dynamic nature that makes it adaptable to the requirements of society at the time of its application in court. There is not a rule of the common law in force today that has not evolved from some earlier rule of common law, gradually in some instances, more suddenly in others, leaving the common law of today when compared with the common law of centuries ago as different as day is from night. The nature of the common law requires that each time a rule of law is applied it be carefully scrutinized to make sure that the conditions and needs of the times have not so changed as to make further application of it the instrument of injustice. Dean Pound posed the problem admirably in his Interpretations of Legal History (1922) when he stated, "Law must be stable, and yet it cannot stand still." And what has been done in the

past is but one of the factors determinative of the present course of our law— a truism which has not gone unrecognized among the great thinkers of the legal profession. Thus, Mr. Justice Holmes recognized that:

"To rest upon a formula is a slumber that, prolonged, means death"; Collected Legal Papers 306 (1920).

Mr. Justice Cardozo has said:

"Few rules in our time are so well established that they may not be called upon any day to justify their existence as means adapted to an end. If they do not function they are diseased. If they are diseased, they must not propagate their kind. Sometimes they are cut out and extirpated altogether. Sometimes they are left with the shadow of continued life, but sterilized, truncated, impotent for harm"; Nature of the Judicial Process 98 (1921).

Professor Williston, in Some Modern Tendencies in the Law (1929), at page 125 observed:

"Uniform decisions of 300 years on a particular question may, and sometimes have been overthrown in a day, and the single decision at the end of the series may establish a rule of law at variance with all that has gone before."

And Holdsworth, in describing the fairly wide limits within which judges under the Anglo-American case law system are enabled "to apply to old precedents a process of selection and rejection which brings the law into conformity with modern conditions," has said:

"This process of selection and rejection has been applied to the law laid down in the Year Books; and generally the rules there laid down, which are still part of our modern law, have survived because they suit modern needs." Essays in Law and History 161, 162 (1946).

But this is no new doctrine. The last words in Coke's Fourth Institute, his last and greatest work, expressed the same thought:

"And we will conclude with the aphorism of [Edmund Plowden] the great lawyer and sage of the law (which we have heard him often say) *Blessed be the amending hand."*

The factors to be weighed in the balance in determining the present course of the law include the reasons for the rule, the present requirements of the environment in which the rule is to be applied, the dangers incident to any change and the evils resulting from its continuance. The power of growth is inherent in the common law. * * *

State v. Culver, 23 N.J. 495, 129 A.2d 715, 721 (1957).

For recent decisions of similar import we refer those interested to the following: Welsh v. Campbell, 41 Hawaii 106, 119–121 (1955) (quoting Florida, Minnesota, and Washington decisions); Good v. Good, 79 Idaho 119, 311 P.2d 756, 759 (1957); La Plant v. E. I. Du Pont de Nemours & Co., 346 S.W.2d 231, 245 (Mo.App.1961); and Mills v. Orcas Power & Light Co., 56 Wash.2d 807, 355 P.2d 781, 788 (1960).

In at least two instances last year this court found it necessary to overrule prior decisions of this court. In Iverson v. Lancaster, 158 N.W.2d 507 (N.D.1968), we overruled Hunder v. Rindlaub, 61 N.D. 389, 237 N.W. 915 (1931); and in Melland v. Johanneson, 160 N.W.2d 107 (N.D.1968), we overruled Lindberg v. Benson, 70 N.W. 2d ,42 (N.D.1955). This was done, however, only after very careful consideration of the common law in the first instance and of constitutional law in the second instance.

In light of the years that have passed since the Auld decision and the legislature's silence as to the effect of a testator's death, we think it proper to review the law as it has developed in relation to the right of waiver of privileged communications by those who stand in the place of or represent decedents.

Pertinent first of all is the tack that our court has taken in respect to the right of waiver of the lawyer-client privilege, a field related to the right of waiver of the physician-patient privilege, as indicated by a decision which held that the rule of privilege of communications between client and attorney does not apply in litigation after the client's death, between parties, all of whom claim under the client. See Syllabus 4, In re Graf's Estate, 119 N.W.2d 478, 479 (N.D.1963).

Subsection 1 of § 31–01–06 reads:

An attorney, without the consent of his client, cannot be examined as to any communication made by the client to him, nor as to his advice given thereon in the course of professional employment;

North Dakota Century Code.

This court decided *Graf's Estate* on the basis that in a controversy not adverse to the estate between heirs at law, next of kin, devisees, legatees, and personal representatives, the interest of the deceased as well as that of the estate is that the truth be ascertained. In so stating, the court cited Winters v. Winters, 102 Iowa 53, 71 N.W. 184 (1897).

We are of the opinion that the search for truth should not stop with subsection 1 but that it should continue under subsection 3.

In recent years, in the case of In re Koenig's Estate, 247 Minn. 580, 78 N.W.2d 364 (1956), the Minnesota Supreme Court has had occasion to consider the issue now before us. In that case the facts were similar to the instant case in that the decedent had executed two wills. The probate court admitted the second will to probate, and on appeal the district court found that the testatrix lacked testamentary capacity when the second will was executed and that it was executed as a result of undue influence exerted upon her by the person named as executrix, who was also the principal bene-

ficiary. On appeal from the district court to the Supreme Court, the proponent of the second will (the person named as executrix) contended that the district court erred in admitting the testimony of the attending physician and certain hospital records over the objection that they were privileged communications. The pertinent part of the Minnesota statute read:

> Every person of sufficient understanding, including a party, may testify in any action or proceeding, civil or criminal, in court or before any person who has authority to receive evidence, except as follows:
>
> \* \* \* \* \* \*
>
> (4) A licensed physician or surgeon shall not, without the consent of his patient, be allowed to disclose any information or any opinion based thereon which he acquired in attending the patient in a professional capacity, and which was necessary to enable him to act in that capacity; \* \* \*.

Minnesota Statutes Annotated § 595.02.

The Minnesota Supreme Court reviewed the law in this country as it related to this issue as follows:

> While the authorities are not in harmony on the question whether the physician-patient privilege may be waived by the heirs of a decedent as against the one named in the will as executor or executrix, some of the divergent views may be explained by a difference in the statutes in the various states. Even where the statutes are the same, there is some difference in the authorities. It should be kept in mind that the physician-patient privilege did not exist at common law but was created by statute, first in New York in 1828 and then later in about two-thirds of the states. The original purpose of this statute was to encourage full disclosure by a patient to his physician by forbidding disclosure of information obtained in such confidential communication. Mostly by judicial decision, the privilege was extended to prevent disclosure after death of the patient. Some of the courts held, and still hold, that there can be no waiver of the privilege after the patient's death. Some of the states which originally followed this rule now permit some waiver due either to a statutory change or a change in judicial decision. The cases on this question are collected in Annotations, 31 A. L.R. 167 and 126 A.L.R. 380. It would serve no useful purpose for us to extend a discussion of the cases here. (footnotes omitted)

In re Koenig's Estate, 247 Minn. 580, 78 N.W.2d 364, 367 (1956).

Although recognizing that a historical difference exists between the attorney-client privilege and the physician-patient privilege, the Minnesota court was of the opinion that the question of waiver after death involved the same consideration. In supporting this view they quoted their earlier case, In re Layman's Will, as follows:

> " \* \* \* The object of the rule, so far as it relates to this class of communications, being the protection of the estate, there remains no reason for continuing it when the very foundation upon which it proceeds is wanting. The testimony called for was quite necessary in order to determine the weight which ought to be given the witness' opinion as to the mental condition of the testator, and his disclosures in no way reflected upon the character or reputation of the deceased. The testimony when given served to protect the estate, and tended to aid in a proper disposition of it. The issue in the case was as to the mental soundness of a person under whom each litigant claimed, and, whatever the result, the interest and the estate of the deceased were not prejudicially affected. It is not an action in which the success of an adverse third party must prove detrimental to the property. Neither of these litigants can be permitted to invoke the rule respecting privileged communications for the purpose of excluding

material and important evidence of the character above described upon the only question involved in the dispute, namely, the sanity of the deceased."

In re Koenig's Estate, *supra*, 368, quoting In re Layman's Will, 40 Minn. 371, 42 N.W. 286, 287 (1889).

The court concluded by holding that "in a contest over the validity of a will where the testamentary capacity of the testator is involved, the heirs who contest the will, as well as the one nominated as executor, may waive the physician-patient privilege insofar as the testimony of the doctor relates to the mental capacity of the testator." In re Koenig's Estate, *supra*, 369.

Pertinent to a review of the decisions of this country is the summary of the writer of an annotation, *Who may waive privilege of confidential communication to physician by person since deceased*, in American Law Reports, Annotated, Second Series:

§ 2. Summary.

The great weight of authority in those jurisdictions in which the statute does not expressly extend the patient's right of waiver of the physician-patient privilege to anyone after his death is that the right to waive extends after the death of the patient to those who are to be regarded as representing, or standing in the place, of the deceased.

\* \* \* \* \* \*

The heirs, legatees, or next of kin of the patient may usually waive the physician-patient privilege although the statute conferring the privilege contains no provision for waiver by anyone after the death of the patient. The rule has been applied in cases involving various types of litigation, such as will contests or suits to set aside allegedly invalid conveyances made by the patient. (footnotes omitted)

Annot., 97 A.L.R.2d 393 (1964).

The same annotation refers to citations from thirteen states to support the following statement:

In cases decided under statutes containing no express provision for waiver, after the patient's death, of the physician-patient privilege, the courts which have recognized the existence of such a power of waiver have usually held that the power may be exercised by heirs, next of kin, or legatees of the patient. (footnote omitted)

Annot., 97 A.L.R.2d 393, § 8 (1964).

 Believing that the objective of statutes securing the privilege is in no way thwarted by permitting those who stand in the place of or represent decedents to waive the physician-patient privilege and that justice will be more apt to result from such waiver, because it will aid in reaching the truth as to the existence of testamentary capacity on the part of the patient, we conclude that the trial court in the instant case was correct in permitting the attending physician to give his opinion concerning the mental capacity of the testator.

We accordingly expressly overrule Auld v. Cathro, 20 N.D. 461, 128 N.W. 1025 (1910), as it relates to that issue.

The answers to the issues numbered 2 and 3 lie in the application of N.D.R.Civ. P. 51(c). Those issues read:

2. Did the Court err in instructing a doctor and nurse as the only expert witnesses and listing all other witnesses as non-expert or ordinary witnesses?

3. Did the Court err in not listing the two attorneys as experts in their field of law and therefore cause misdirection of the Jury by the Court?

Rule 51(c) reads:

Rule 51. INSTRUCTIONS TO JURY

(c) Exceptions to Instructions. The giving of instructions and the failure to instruct the jurors shall be deemed excepted to unless the court, before instructing the jurors, shall submit to counsel the written instructions which it proposes to give to the jurors and shall

ask for exceptions to be noted, and thereupon counsel must designate such parts or omissions of such instructions as he may deem objectionable. Thereafter, only the parts or omissions so designated shall be excepted to by the counsel designating the same. All proceedings connected with the taking of such exceptions shall be in the absence of the jurors and a reasonably sufficient time shall be allowed counsel to take such exceptions and to note the same in the record of the proceedings.

North Dakota Rules of Civil Procedure.

Pursuant to rule 51(c) the district court, before instructing the jurors, submitted to counsel the written instructions which it proposed to give the jurors and asked that exceptions be noted. Counsel for the first family stated that he had one exception, which he noted to paragraph 3 of page 4 of the instructions. That paragraph reads:

The Jury is instructed that the words "sound and disposing mind and memory," and the term "testamentary capacity," are synonymous and mean a mind sufficient to enable a testator to remember and know what his property is, who are the natural objects of his bounty, and who are the proposed beneficiaries, and his duties toward them and to understand and appreciate the character of the act which he is performing. One may have testamentary capacity, although his memory be somewhat impaired, as by old age, if he understands and remembers enough to act with such comprehension and perception in making his will.

█ It is obvious that that part of the instructions excepted to does not relate to those parts which are now complained to be error. As the trial court complied with rule 51(c), those parts of the instructions not excepted to are now the settled law of the case. See: Bartholomay v. St. Thomas Lumber Co., 148 N.W.2d 278 (N.D.1966); Julson v. Loyal Order of Moose No. 822, 140 N.W.2d 39 (N.D.1966); Klokstad v. Ward, 131 N.W.2d 244 (N.D.1964); Helgeson v. Locken, 130 N.W.2d 573 (N.D. 1964); and Chicago, Milwaukee, St. Paul & Pacific Ry. Co. v. Johnston's Fuel Liners, 122 N.W.2d 140 (N.D.1963).

Applying rule 51(c), we find no basis for considering issues 2 and 3 in this court. Nevertheless, we have reviewed them and, without discussion, find no misdirection in the instructions giving rise to them.

The fourth issue raised is stated as follows: "Did the evidence on testamentary capacity justify the verdict?" In considering this issue we are governed by certain well established rules.

█ In a will case in which the issues of testamentary capacity and undue influence had been submitted to a jury, Judge Thomas J. Burke, speaking for this court, said:

Upon an appeal from a case tried to a jury, our review of the facts is limited to a consideration of whether there is substantial evidence to sustain the verdict. If there is such evidence, we are bound by the verdict.

In re Hendricks' Estate, 110 N.W.2d 417, 421 (N.D.1961).

█ On an appeal from a judgment rendered on a verdict or from an order denying a motion for judgment notwithstanding the verdict or in the alternative for a new trial, there are two additional rules that we must follow. They are: First, in determining the sufficiency of the evidence to sustain the verdict of the jury, the evidence must be viewed in the light most favorable to the verdict; Second, the credibility of the witnesses and the weight to be given their testimony are questions of fact for the jury to determine. See Syllabus 6 and 7 of Sprenger v. Sprenger, 146 N.W.2d 36 (N.D.1966).

No useful purpose would be served in the instant case by setting forth in detail the evidence submitted by the parties and by indicating how it is in conflict.

At the time of the decedent's admission to the hospital on January 3, 1966, he was 83 years old and in the advanced stages of an illness which caused his death only eight days later. The contested will was executed in the hospital on January 6, 1966. From the testimony of Dr. Meredith, who was the attending physician, of Sister Mary Zita, who was administrator, director of nursing personnel, floor supervisor, and anesthetist at the hospital, and of Mr. Phillip Nyberg, who was the decedent's hospital roommate (the latter testifying through a deposition), the jury could have found that the decedent did not have testamentary capacity at the time of the execution of the will. The first family point to the testimony of the lawyer who drew the will and was present when it was executed, of the lawyer who witnessed it, and of others, disclosing what they believe to be facts indicating that the decedent had testamentary capacity at the time of the execution of the will, the will having been executed before the decedent received any drugs or medication which may have clouded his mind later, the later time, they contend, being the period which influenced the others.

In light of the rules which govern an appeal of this nature it is not for us to try the case anew or to attempt to determine what we would decide if we were in the place of the jury. Accordingly, applying the rules as earlier stated, we find that the evidence is sufficient to support the verdict.

The fifth and final issue raised is whether the verdict is against the law. As the same arguments were made in discussing this issue as in discussing the preceding one, and as these have been considered and found to be without merit, we deny relief under the latter issue on the basis of our denial of relief under the preceding one.

The judgment and order appealed from are therefore affirmed.

PAULSON and STRUTZ, JJ., concur.

KNUDSON, Judge (dissenting).

I dissent. I do not agree with the conclusion of the majority that the evidence is sufficient to sustain the verdict of the jury.

It is well settled in this state that on an appeal from a judgment notwithstanding the verdict the question before this court is whether the evidence is sufficient to sustain the verdict. In re Hendricks' Estate, 110 N.W.2d 417 (N.D.1961); Stormon v. Weiss, 65 N.W.2d 475 (N.D. 1954); Keller v. Reichert, 49 N.D. 74, 189 N.W. 690 (1922).

The first family established the execution of the will by the two subscribing witnesses, Mr. Depuy and Mr. McEnroe, who were the only persons present at the time, who testified that the testator, Louis Lembke, executed the will. Mr. DePuy testified that he had sufficient mental capacity to make a will, to know the disposition he was making of his property and the beneficiaries thereof, and that "the testator was entirely competent, fully understood everything that transpired and what he was doing with reference to his property."

The burden was on the first family to establish the execution of the will in the manner prescribed by statute. This burden was met by the testimony of the subscribing witnesses. The second family challenge the validity of the will upon the ground of the lack of competency of the testator to make a will. They had the burden to sustain this challenge by competent evidence that at the time the will was made Mr. Lembke did not have testamentary capacity. Stormon v. Weiss, *supra.*

It is the settled law in this state that where a will is contested on the grounds that the testator did not have sufficient mental capacity to make a will the con-

testant has the burden of establishing by competent evidence that at the time the will was made the testator did not have testamentary capacity. Stormon v. Weiss, *supra*.

We have also said that there is a presumption that a testator was sane at the time of the execution of his will until the contrary appears by competent proof. Kingdon v. Sybrant, 158 N.W.2d 863 (N.D. 1968).

The question as to the mental competency of the testator to make a will should be determined as of the time of the execution of the will.

"The critical inquiry in determining testator's mental capacity to execute a will is directed to his condition of mind at the very time he signed the will and evidence of his previous or subsequent conduct is admissible only so far as it may throw light on his mental condition at the precise moment that the will was signed." Stormon v. Weiss, N.D., 65 N.W.2d 475, 608.

Bender v. Bender, 72 N.W.2d 220, 223 (N.D.1955).

The second family have not met their burden of establishing by competent evidence that at the precise moment the will was signed the testator did not have testamentary capacity. The second family have not overcome the fundamental principle that sanity and testamentary capacity are presumed.

The court should not have permitted Dr. Meredith to testify as to the competency of Louis Lembke to make a will under subsection 3 of § 31–01–06, North Dakota Century Code. Without the testimony of Dr. Meredith the evidence may be insufficient to sustain the verdict, and if so the motion of the first family for judgment notwithstanding the verdict should have been granted by the trial court, except that there was other testimony relating to the testamentary capacity of the testator, and as we cannot speculate on

what testimony the jury based its verdict a new trial should be granted.

The first family objected to the testimony of Dr. Meredith on the grounds that his testimony was inadmissible. They contend that his testimony consisted of information acquired by Dr. Meredith while attending the testator, Louis Lembke, as his physician, and, therefore, such testimony was privileged and should have been excluded under the provisions of § 31–01–06(3), N.D. C.C., as amended by chapter 230, § 1 of the 1965 Session Laws, which reads as follows:

A person cannot be examined as a witness in the following cases:

\* \* \* \* \* \*

3. A physician or surgeon, without the consent of his patient, cannot be examined as to any information acquired in attending the patient or as to any communication made by the patient to him in the course of professional employment;

The original statute read as follows:

A person cannot be examined as a witness in the following cases:

\* \* \* \* \* \*

3. A physician or surgeon, without the consent of his patient, cannot be examined as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient;

North Dakota Century Code § 31–01–06 (3) (Parent Volume).

Although the amended statute has not been before this court, the original statute has been fruitful of some litigation. Questions as to the construction and effect of the original statute had arisen in several cases before the enactment of chapter 230, § 1, Session Laws 1965.

In State v. Werner, 16 N.D. 83, 112 N.W. 60 (1907), we held that the statements made by the defendant to the physician in the presence of a third person, who was competent to testify thereto, were not privileged

under the statute and the physician could be examined as to the conversation.

In Auld v. Cathro, 20 N.D. 461, 128 N.W. 1025, 32 L.R.A.,N.S., 71 (1910), it was held that all information acquired by the physician from a patient in attending the patient professionally comes within the privilege, regardless whether or not such information was necessary to enable the physician to prescribe or act for the patient, and that such evidence was inadmissible as "the privilege is personal with the patient, that it applies in testamentary matters, and cannot be waived by the heirs and personal representatives."

In Booren v. McWilliams, 26 N.D. 558, 145 N.W. 410 (1914), the statement or communication made to the physician after the patient's confinement, was held not within the privilege as this information was not necessary to enable the physician to prescribe or act for her. The court indicated that the privilege extended only to those communications necessary to enable the physician to prescribe for the patient.

In State v. Moore, 52 N.D. 633, 204 N.W. 341 (1924), the information acquired by the physician in examining a prisoner in the custody of the sheriff, such examination having been requested by the sheriff, was held to be privileged.

In Meyer v. Russell, 55 N.D. 546, 214 N.W. 857 (1927), any information which the physician acquired while treating the patient, even though such communication or information was not necessary to enable the physician to prescribe or act for the patient, was held to be privileged, and only the patient could waive the privilege.

In McDonnell v. Monteith, 59 N.D. 750, 231 N.W. 854 (1930), the plaintiff, by examining his physician as his witness as to his diagnosis and treatment of the injury to his arm and the result of such treatment, waived the privilege.

In Stormon v. Weiss, 65 N.W.2d 475 (N.D.1954), the attending physician who subscribed to the will as a witness at the request of the testatrix was permitted to testify "the same as any other subscribing witness," the court saying that the testatrix waived the restrictions on the competency of the physician to testify as a witness by her request that the physician witness her will and who did subscribe to the will as a witness.

This review of these cases discloses that this court in construing the original statute generally has held that any information given or communication made to a physician by the patient or acquired by the physician in attending the patient was privileged, and the testimony of the physician relating to such information or communication was properly excluded, and that the privilege was personal with the patient and could be waived only by him during his lifetime, and after his death the right to waive terminated and could not be exercised by others. In the following cases the physician was permitted to testify, as the court was of the opinion that the information was not privileged because of the peculiar circumstances in each case or had been waived by the patient: In State v. Werner, where the statements of the defendant to the physician were made in the presence of a third person, who would have been competent to testify to the statement; in Booren v. McWilliams, where the information was acquired after the time it was necessary for the physician to treat the plaintiff; in McDonnell v. Monteith, where the plaintiff waived the privilege by calling the physician as his witness and examining him as to the nature of his injuries; and in Stormon v. Weiss, where the testatrix waived the privilege by requesting the attending physician to witness her will, and who did subscribe to the will as a witness, *the physician was permitted to testify as a subscribing witness,* the court indicating that the physician would not have been competent to testify if he had not been a subscribing witness.

There is no complaint that these former decisions were not carefully considered or that the conclusions were arrived at without

the full expression of reason. Only one inference can be drawn from a review of the former decisions announced by this court, and that inference is that they were arrived at after deliberate, thorough deliberation. The decisions heretofore rendered by this court were reasoned conclusions backed by authority and considered with care. No cogent reason has been presented sustaining the first family's conclusion that the former decisions were erroneous.

This court, in Auld v. Cathro, thoroughly considered the contention that the rule permitting the personal representative or heirs or legatees or those who succeeded to the estate in will matters to waive the privilege as it related to testimony of the attorneys as to the very transaction of preparing the will be made applicable in the case of physicians, and after such thorough and deliberate consideration declined to accord the rule as to attorneys to physicians, and quoted from In re Hunt's Will, 122 Wis. 460, 100 N.W. 874:

Whether this last idea may be correct as to communications to attorneys with reference to property transactions, it certainly is not true with reference to the sheltering of information acquired by attending physicians. The purpose of that statute is personal. It is to protect the patient himself from disgrace or chagrin. Its effect on property rights or estate is only incidental. [Citations omitted.] Such reasons do not cease upon the death of the patient.

Auld v. Cathro, 20 N.D. 461, 128 N.W. 1025, 1030, 32 L.R.A.,N.S., 71 (1910).

It is a settled rule of statutory construction that when a statute or a clause or provision thereof has been construed by a court of last resort, and the same is substantially reenacted, the legislature may be regarded as adopting such construction. 50 Am.Jur. Statutes, § 442 (1944).

The rule is well settled that "where a statute which has been construed by the courts of last resort has been reenacted in the same, or substantially the same,

terms the legislature is presumed to have been familiar with its construction and to have adopted it as a part of the law, unless a contrary intent clearly appears, or a different construction is expressly provided for." 59 C.J. pp. 1061, 1963.

State ex rel. Johnson v. Broderick, 75 N.D. 340, 27 N.W.2d 849, 866 (1947).

The amended statute does not indicate that a contrary intent or a different construction is expressly provided for in the amendment. On the contrary, the phrase "without the consent of the patient" has been carried into the amended statute without change.

The legislature, at the time of the adoption of the 1965 amendment, presumably was familiar with the prior judicial construction placed upon § 31–01–06(3) in Auld v. Cathro and intended that the statute should be likewise construed subsequent to the amendment. Lapland v. Stearns, 79 N.D. 62, 54 N.W.2d 748 (1952); State v. Broderick, *supra*.

That the legislature amended § 31–01–06 (3) without any change in the phrase "without the consent of the patient" clearly indicates the intention of the legislature to adopt the construction placed by this court upon that phrase in Auld v. Cathro as to who may waive the privilege, and particularly so when the legislature in the same amendment adopted the construction in Auld v. Cathro as to what communications were confidential.

The interpretation in Auld v. Cathro by our court has been adhered to in several subsequent cases, including the recent case of Stormon v. Weiss, 65 N.W.2d 475, wherein a physician was permitted to testify, as a subscribing witness, a..er death, when the testatrix requested the physician to witness her will, and the physician did subscribe the will, this court held that the testatrix thereby waived the restriction on the competency of the physician as a witness. The court therein indicated that otherwise the attending physician would not have been a competent witness to testify.

And in Meyer v. Russell, 55 N.D. 546, 214 N.W. 857 (1927), the exclusion by the trial court of the testimony of the attending physician of the deceased grantor regarding her competency to execute a deed was approved by this court.

There is nothing in the amended statute to indicate that the legislature intended any different meaning to the phrase "without the consent of the patient" than as construed by this court in Auld v. Cathro as to who may waive the privilege, and this court subsequently, in Meyer v. Russell, and in Stormon v. Weiss, adhered to the principle that only the patient himself may waive the privilege, and that it cannot be waived by others.

In support of the rule that the privilege cannot be waived by others we quoted with approval in Auld v. Cathro, *supra*, 128 N.W. at p. 1029, from In re Hunt's Will, 122 Wis. 460, 100 N.W. 874:

"Further, and more important to the present controversy, we have held that the privilege is created for the protection of the patient, and is personal to him; and have in the plainest terms repudiated the doctrine supported by some authority elsewhere that others can in any degree waive the privilege. * * *"

We have said many times that this court cannot legislate; we cannot change statutory law by judicial decision. If there are any changes to be made in the statute, that is a matter to be left to the legislature, as it is for the legislature to determine policy, not for the courts.

As said by Mr. Justice Strutz in Fetzer v. Minot Park District, 138 N.W.2d 601, 604 (N.D.1965):

The courts cannot legislate, regardless of how much we might desire to do so. Therefore, regardless of how worthy a claim against a municipal corporation might be, we cannot assume the functions of the Legislative Assembly. Our power is limited to passing on laws enacted by the Legislature, and, if the Legislature

fails to act, we cannot change the law by judicial decision. The question here presented is one that should be addressed to the Legislative Assembly, and not to the courts. As was said by the Honorable A. M. Christianson, in his concurring opinion to Anderson v. Board of Education of City of Fargo, 49 N.D. 181, 190 N.W. 807:

"If the rule is wrong, the Legislature has ample power to change it. It is the duty of the courts to enforce the law as it exists."

In Portland Credit Union v. Hauge, 169 N.W.2d 106 (N.D.1969), Mr. Justice Strutz, speaking for this Court, said at Syllabus 2:

The construction of a statute by the courts supported by long acquiescence on the part of the Legislative Assembly, or by the failure of the Legislature to amend the law, is evidence that such construction is in accordance with legislative intent.

Mr. Justice Strutz cited in support thereof Kline v. Landeis, 147 N.W.2d 897, 902 (N.D.1966), where Mr. Justice Erickstad, speaking for this Court said:

The legislature, in failing to amend the statute in light of the court's construction, has acquiesced in that construction, and thus has indicated that the construction is in accord with legislative intent.

See also, Public Service Commission v. City of Williston, 160 N.W.2d 534 (N.D. 1968); Regent Co-op. Equity Exch. v. Johnston's Fuel Liners, 122 N.W.2d 151 (N.D. 1963); Lapland v. Stearns, 79 N.D. 62, 54 N.W.2d 748 (1952); State ex rel. Johnson v. Broderick, 75 N.D. 340, 27 N.W.2d 849 (1947); Taylor v. McCarty, 68 S.D. 510, 4 N.W.2d 816 (1942); In re Gooder's Estate, 68 S.D. 415, 3 N.W.2d 478 (1942).

The South Dakota Supreme Court in a recent case said that the statute providing for the physician-patient privilege is to be liberally construed in favor of the patient and concluded that any changes in the statute should be made by the legislature, and not by judicial decision.

We realize that the privilege statute and its liberal construction have been severely criticized by eminent legal writers. See Wigmore, Evidence, McNaughton Rev. 2380(a) and McCormick on Evidence, § 108. Their views are urged and relied on by the defendants. However, with us these are matters of legislative mandate. See Marfia v. Great Northern Ry. Co., 124 Minn. 466, 145 N.W. 385. Accordingly we are not free to mold our law to their views.

Hogue v. Massa, 80 S.D. 319, 123 N.W. 2d 131, 135, 5 A.L.R.3d 1236 (1963).

And the South Dakota Supreme Court has said that where a judicial interpretation of a statute has been adopted by the legislature through reenactment of the statute, the supreme court could not reconsider its construction. Taylor v. McCarty, 68 S.D. 510, 4 N.W.2d 816 (1942).

The general rule is that nothing may be read into a statute which is not within the manifest intention of the legislature as gathered from the act itself, and that a statute should not be construed any more broadly or given any greater effect than its terms require. Where the language of the statute is clear in limiting its application to a particular class of cases and leaves no room for doubt as to the intention of the legislature, there is no authority to transcend or add to the statute which may not be enlarged, stretched, or expanded, or extended to cognate or related cases not falling within its provisions. 50 Am. Jur. Statutes § 229 (1944).

Here, I repeat, the legislature has amended § 31–01–06(3), N.D.C.C., having in mind the previous decisions of this court on not only what information may be privileged, but also as to who may waive the privilege after the death of the patient, and the legislature has seen fit not to enlarge the statutory provision that the privilege may be waived only by the patient to permit others to waive the privilege in certain cases.

While we should not be as robots in our deliberations and in the application of the rules of law in each case, nevertheless we ought not to pick and choose such rules as may fit our whim and fancy, even at the risk of being categorized as doing our work by a computer when we adhere to prior construction of statutes. We ought not to exercise that judicial license whereby the rules are changed during the course of the litigation without notice, to the end that neither the litigants, nor the lawyers, nor even the judges of our courts, know what rules ought to be applied from day to day. Surely there ought to be some stability in the rules upon which we could depend. We should not depart from the settled construction of the language of a statute in the absence of cogent reasons for making the change.

The majority give as their reason for departing from the settled construction of the statute "that justice will be more apt to result from such waiver, because it will aid in reaching the truth as to the existence of testamentary capacity."

If such be the reason for permitting others to waive the privilege after the death of the patient, would not the same reason be sufficient to permit others to waive the privilege during the lifetime of the patient—if seeking the truth be the purpose of the testimony—and thereby emasculate the statute. If the principle of seeking the truth is to govern the admissibility of evidence could it be carried so far as to supersede the constitutional and statutory provisions relating to self-incrimination and illegal search and seizure? Of course, such principle cannot prevail over these constitutional and statutory provisions, and ought not to prevail here against the plain words of the statute.

The majority, in further support of their decision to overrule Auld v. Cathro, state that in at least two instances last year this Court found it necessary to overrule prior decisions of this Court, and refer to Iverson v. Lancaster, 158 N.W.2d 507 (N.D.

1968), overruling Hunder v. Rindlaub, 61 N.D. 389, 237 N.W. 915, 931; and in Melland v. Johanneson, 160 N.W.2d 107 (N.D. 1968), overruling Lindberg v. Benson, 70 N.W.2d 42 (N.D.1955). The court went on to say this was done, however, only after very careful consideration of the common law in the first instance, and of constitutional law in the second instance. That we have heretofore reversed former decisions is not a cogent reason for overruling Auld v. Cathro.

Upon a review of the *Iverson* case, after an analysis of several cases, we said:

> As our analysis of the trend of the law may have indicated, we are now convinced tht it is timely and proper, in light of the adoption of N.D.R.Civ.P. 43 (b) that our decision in Hunder v. Rindlaub be overruled.

It is interesting to note that our decision in *Iverson* to overrule Hunder v. Rindlaub is supported by Rule 43(b), which rule was not in effect at the time Hunder v. Rindlaub was decided by this court. The ruling in Hunder v. Rindlaub was based on § 7870, Compiled Laws of 1913, which statute has now been superseded by Rule 43 (b) of the North Dakota Rules of Civil Procedure.

It is not necessary to go into an analysis of the differences between § 7870 and Rule 43(b), except to state that under Rule 43 (b) a party may call an adverse party and "interrogate him by leading questions and contradict and impeach him," whereas § 7870 uses general language to the effect that the examination may be made "as if under cross-examination."

In Iverson v. Lancaster we quoted from State ex rel. Miles v. Brainin, 224 Md. 156, 167 A.2d 117, 120, 88 A.L.R.2d 1178 (1961), where the Maryland statute was similar to our Rule 43(b), and we said, quoting the Maryland court:

> That this is the case is further buttressed by the striking similarity between the

provisions of our statute and Rule 43(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. Under that rule, in cases involving pretrial depositions, the federal cases require the deponent to answer questions involving expert testimony. See Russo v. Merck & Co., D.C.R.I.1957, 21 F.R.D. 237 and Broadway & Ninety-Sixth Street Realty Company v. Loew's, Inc., D.C.S.D.N.Y.1958, 21 F.R.D. 347.

It is apparent, therefore, that the decision in Iverson v. Lancaster overruling Hunder v. Rindlaub was founded on Rule 43(b) under the construction of that Rule by the federal courts. I have carefully read Iverson v. Lancaster and I can find therein no reference to the application of the common law to that decision of our court.

While in *Melland* we did flatly reverse the *Lindberg* case by holding that a classification within a class was discriminatory and therefore the initiated measure must fall as being in contravention of §§ 11 and 20 of the North Dakota Constitution and § 1 of the Fourteenth Amendment to the United States Constitution as a denial of equal protection of the laws, we must remember that in the *Lindberg* case the initiated measure was upheld as constitutional by a 3 to 2 decision, wherein the dissenting judges argued that the constitutional measure was unconstitutional for largely the same reasons we set forth in *Melland* in holding the initiated measure unconstitutional. And to support our opinion in *Melland* we referred to chapter 54–44, North Dakota Century Code, establishing the Department of Accounts and Purchases providing for competitive bids for purchases made by the State through the Department of Accounts and Purchases, wherein we said:

> These newer statutes serve, not only to further protect the public interest, but, in the instant case, to obviate the reasoning which may have previously supported this court in sustaining the highly discriminatory classifications which we

have today found unreasonable and thus invidious.

Melland v. Johanneson, 160 N.W.2d 107, 116 (N.D.1968).

In each of the cases cited as examples of instances when we have reversed former decisions of this court we have in support of such reversal referred to some statutory change. And we might say generally that because this court has heretofore reversed itself on several occasions is not sound reason for the reversal of a former decision as in this case there is no precedent upon which we can found such reversal.

I agree with the opinion of this court in In re Graf's Estate that an attorney is competent to testify as to confidential communications after the client's death in litigation in will matters between parties all of whom claim under the client, as that was an exception to the rule of law recognized at common law, but I am unable to agree that that case supports the second family's position in this case where we are concerned with confidential communications between physician and patient. The privilege as to communication between physician and patient was created by statute, and was not known at common law.

At common law there was no privilege as to communications between physician and patient, and this rule still prevails where not changed by statute * * *. The privilege exists only in accordance with, and to the extent allowed by, statute. Such statutory privilege is one which the legislature may modify, limit, or abolish in whole or in part, but the courts may not do so, except as power may be conferred on them by the legislature.

97 C.J.S. Witnesses §§ 293, 824–825 (1957).

The authorities are not in accord on the question whether the physician-patient privilege may be waived by a personal representative or by the heirs of a decedent in will matters. There is some difference in the authority even where the statutes are similar, and some of the divergent views may be explained by a difference in the statutes of the various states. The cases on the question of waiver of the privilege after the patient's death are discussed in the annotations in 31 A.L.R. 167, 126 A. L.R. 380, and, more recently, in 97 A.L.R. 2d 394. A review of the cases in those annotations discloses that the cases are in hopeless conflict on the question of waiver, probably because of the difference in the statutes providing for exceptions to the rule permitting either the personal representative, or the heirs, or the beneficiaries of life insurance policies, to waive the privilege in certain cases. Whether there is a majority, or a modern, or an enlightened rule is a matter of conjecture upon which we ought not to render our decisions.

I would set aside the judgment and remand this case for a new trial. There was other evidence relating to the testamentary capacity of the testator and we cannot tell which testimony the jury considered in reaching its verdict.

TEIGEN, Chief Justice (dissenting).

I concur in the dissent of Judge Knudson.

The matter of certain communications being privileged against disclosure by a witness is a rule of evidence based on public policy declared by statute. In the absence of statute, the general rule is that there is no privilege. 97 C.J.S. Witnesses § 252.

Subsection 3 of Section 31–01–06, N.D. C.C., as originally enacted, was construed in Auld v. Cathro, 20 N.D. 461, 128 N.W. 1025, 32 L.R.A.,N.S., 71, to provide that a physician cannot testify as to the mental capacity of a testator if his opinion is formed solely from information given while treating the testator professionally. Several subsequent court opinions cited in Judge Knudson's dissent have followed the rule established in that case.

In 1965 the Legislature amended subsection 3 but retained and readopted the exact language used in the original act relative to the privilege, with like context, but broadened the privilege relationship to include any communication made to the physician in the course of professional employment.

In construing amendments to statutes the court takes judicial notice of the history of the original Act as well as the amendment, and it must presume that the Legislature has, at all times, been aware of the history of the terms used in the original Act which are repeated in the amendment. Gimble v. Montana-Dakota Utilities Co., 77 N.D. 581, 44 N.W.2d 198.

Where a statute which has been construed by a court of last resort is re-enacted in the same, or substantially the same, terms, the Legislature is presumed to have been familiar with the construction and to have adopted the construction as a part of the law, unless a contrary intent clearly appears. State ex rel. Johnson v. Broderick, 75 N.D. 340, 27 N.W.2d 849; Lapland v. Stearns, 79 N.D. 62, 54 N.W.2d 748.

"*Judicial and executive construction of amended act.* In arriving at the legislative intent, the language of an amendment must be construed in the light of previous decisions by courts of last resort construing the original act, it being presumed that the legislature when adopting the amendment had in mind such judicial construction; and the construction placed on the language of the original act must be adhered to after an amendment thereof which does not in any way change the particular language." 82 C. J.S. Statutes § 384, page 900.

No intent appears from the language of the amendment in 1965 to establish a rule different from that announced in Auld v. Cathro, *supra*.

When the Legislature amended and re-enacted subsection 3 and readopted the identical language used in the original Act, which language had been construed by this court in Auld v. Cathro, *supra*, it adopted the construction given it by the court and it became a part of the legislative Act as a clear expression of legislative intent. Therefore, if we reverse Auld v. Cathro, *supra*, we are, in effect, amending subsection 3 as amended by the Legislature in 1965.

For the reasons aforesaid, it is my opinion the majority have not only overruled Auld v. Cathro, *supra*, but have amended the statute. This is a usurpation of a purely legislative power and contrary to the constitutional provisions distributing the powers of government among the three departments, the legislative, executive and judicial. Courts cannot legislate. It is the function of the courts to interpret law and not to make law.